AUSA CHRISTINA EGAN 312-353-4095

AO 91 (REV 5/85) Criminal Complaint

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

V.

RICHARD E. DORONIUK,
MAHMOUD SHAMAH, aka "Mike," and
LARRY CROSS, aka "Peanut"

**F I L E D**  NF

OCT 2 4 2006
Oct 24 2006
**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

**UNDER SEAL**

**CRIMINAL COMPLAINT**

# 06CR0782

CASE NUMBER:

**MAGISTRATE JUDGE NOLAN**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my

knowledge and belief:

Beginning no later than in or about June 2006 and continuing until at least August 2006 in the Northern District of
Illinois, defendants did conspire with each other and with others to steal money belonging to the United States,
namely approximately $31,100 in funds belonging to the Federal Bureau of Investigation, in violation of Title 18,
United States Code, Section 641, all in violation of Title 18, United States Code, Sections 371 and 2.

I further state that I am an FBI Special Agent and that this complaint is based on the following facts:

See Attached Affidavit.

Continued on the attached sheet and made a part hereof:  _X_ Yes __ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

October 24, 2006 _____ at    Chicago, Illinois _____
Date                                           City and State

Hon. Nan R. Nolan   U.S. Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

| STATE OF ILLINOIS | } |
| COUNTY OF COOK | } |

### **AFFIDAVIT**

I, Jacqueline T. Albus, being duly sworn under oath, state as follows:

## I.    **INTRODUCTION**

1.    I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed since 2004. I have received specialized training in corruption matters while employed as a Special Agent. I am familiar with and have participated in all of the normal methods of investigations, including but not limited to physical surveillance, general questioning of witnesses, and use of search warrants, informants, cooperating witnesses, pen registers, undercover agents, consensual recordings, and Title III wiretaps. I am currently assigned to a public corruption squad. As a member of an FBI public corruption squad, I have been involved in the investigation of law enforcement officers engaged in various forms of criminal conduct.

2.    The information contained in this Affidavit is based upon my personal participation in this investigation and my conversations with other law enforcement officers involved in this investigation including but not limited to my review of or discussions with other law enforcement officers about: (1) results of physical surveillance conducted by law enforcement officers; (2) reports made by other law enforcement officers; (3) telephone subscriber records, telephone, pen register records, and trap and trace device records; (4) criminal history reports and National Crime Information Center (NCIC) records; (5) information summarized below from other law enforcement officers; (6) documents supplied by and oral

1

discussions with officers of the Chicago Police Department Internal Affairs Division (CPD-

IAD); (7) information obtained from consensually recorded conversations; (8) information

provided by a cooperating source; and (9) information obtained from conversations intercepted

pursuant to court-authorized Title III wiretaps.

     3.     Specifically, as further detailed below, the FBI obtained authority from Chief

Judge James F. Holderman to intercept conversations over telephones used by RICHARD E.

DORONIUK (Doroniuk Phone) and LARRY CROSS, aka "Peanut" (Cross Phone).[1]  Summaries

of many of these Title III conversations are set forth throughout this Affidavit,[2] and they reveal

---

[1]The following Orders were authorized by Chief Judge James F. Holderman:
(i) Order dated 7/24/2006 authorizing the interception of wire communications over
Cross Phone (a cellular telephone assigned number (773) 266-2945 bearing IMSI #
310410069067383 subscribed to by DBS Communications, Inc. and operated on the
network of Cingular Wireless).
(ii) Order dated 8/3/2006, authorizing the interception of wire communications over
Doroniuk Phone (a cellular telephone assigned telephone number (773) 879-9507 bearing
Electronic Serial Number (ESN) # 03312532373, subscribed to by Richard Doroniuk and
operated on the network of US Cellular).
(iii) Order dated 9/1/2006 authorizing the continued interception of wire communications
over Doroniuk Phone.
(iv) Order dated 9/28/2006 authorizing the continued interception of wire
communications over Doroniuk Phone.

[2]Throughout this Affidavit, I describe various conversations that were intercepted
pursuant to court-authorized Title III wiretaps or were consensually recorded or unrecorded.
These descriptions often include my understanding of what is being said during such
conversations. This understanding and interpretation of the conversations is based on (I) the
contents and context of the conversations, (ii) my experience as a law enforcement officer and
the experience of other law enforcement officers in this investigation, including our experience
listening to the conversations as a whole, and (iii) the investigation to date, including information
obtained from a cooperating witness. All times listed are approximate. The summaries of the
recorded conversations, either intercepted or consensually recorded, set forth in this Affidavit
are based on draft – not final – transcriptions. Finally, the summaries below do not include all
potentially criminal calls intercepted during the periods of interception or consensually recorded
or unrecorded conversations, or all statements or topics covered during the course of the
intercepted or consensually recorded or unrecorded conversations.

the corrupt nature of the relationship between DORONIUK, CROSS, and others.

4.      This Affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging that from no later than in or about June 2006 and until at least August 2006, RICHARD E. DORONIUK, MAHMOUD SHAMAH, aka "Mike," and LARRY CROSS, aka "Peanut," did conspire with each other and with others to steal government funds in violation of Title 18, United States Code, Section 641, all in violation of Title 18, United States Code, Section 371 and Title 18, United States Code, Section 2. Since this Affidavit is being submitted for this limited purpose, I have not included each and every fact known to me concerning this investigation.

## II.     SUMMARY OF PROBABLE CAUSE

### A.     Overview of Investigation

5.      This investigation has revealed that RICHARD E. DORONIUK and MAHMOUD SHAMAH, aka "Mike," are police officers (POs) with the Chicago Police Department (CPD) who are involved in corruptly obtaining state search warrants for locations for the purpose of committing ripoffs of drugs and/or money at those locations. The investigation has also revealed that LARRY CROSS, aka "Peanut," a drug dealer, and others have assisted the POs in connection with ripoffs of drugs and/or money by posing as informants before state judicial officers for the search warrants obtained by the POs, and in some instances providing information to the POs about ripoff targets.

6.      The following is a brief summary of each individual:

a.      **RICHARD E. DORONIUK**: DORONIUK is a CPD PO assigned to the 22nd District. He has been a PO since January, 2000, and is currently assigned to a tactical team.

3

b.     **MAHMOUD SHAMAH** (aka "Mike"):  SHAMAH is a CPD PO assigned to the

22nd District.  He has been a PO since August, 2001, and is currently assigned to a tactical team.

c.     **LARRY CROSS** (aka "Peanut"):  CROSS is a drug dealer who assisted

DORONIUK and SHAMAH in ripping off drug dealers by identifying potential ripoff targets and

then helping to arrange for those ripoffs to occur.

**B.     Ripoff of Storage Unit on 6/13/2006 and Subsequent Wiretap of Cross Phone**

7.     The FBI obtained information from a cooperating witness (CW1)[3] regarding

telephone conversations between CW1 and CROSS in which CROSS discussed ripoffs

conducted by the POs.  Under the direction of the FBI, CW1 also had a number of consensually

recorded telephone conversations with CROSS over Cross Phone in which CROSS discussed his

involvement in these ripoffs.[4]  The consensually recorded calls also included conversations in

which CROSS asked CW1 to provide information about locations for the POs to ripoff.

8.     At the direction of the FBI, CW1 provided information to CROSS about a storage

unit containing drugs and drug proceeds.  The FBI had placed $20,000 in the storage unit.  On

6/13/2006, officers later identified as DORONIUK, SHAMAH, Officer A, and Officer B, went to

the storage unit with a search warrant.  When the FBI later returned to this location, the $20,000

---

[3]CW1 is a self-admitted drug dealer who began cooperating with the government after
being charged in a federal drug case.  CW1 is cooperating in the hopes of receiving a reduced
sentence.  CW1 began cooperating with law enforcement in 2005.  CW1 has cooperated in
several different matters.  CW1's cooperation has included consensually recorded telephone calls
and meetings with subjects.  The information provided by CW1 in this investigation is believed
to be reliable and has been corroborated by consensually recorded conversations, pen register
information, and conversations intercepted over court-authorized Title III wiretaps.  CW1 has
approximately seven convictions for offenses including weapons offenses, drug offenses, and
burglary.  CW1's most recent conviction was in the mid-1990's.

[4]These conversations occurred prior to the time of the wiretap on Cross Phone.

4

was no longer in the storage unit.  According to CPD records obtained from CPD-IAD, no money was ever turned in by the POs from the search.

9.     On 7/24/2006, Chief Judge James F. Holderman signed a court order authorizing the interception of wire communications to and from Cross Phone, a cellular phone used by CROSS.  Interception began on 7/24/2006.  On 7/25/2006, DORONIUK (who was using Doroniuk Phone), was intercepted in a conversation with CROSS discussing an additional ripoff using information provided by CW1.  The next day (7/26/2006), CROSS had telephone conversations with CW1 intercepted over Cross Phone in which CROSS told CW1 that he (CROSS) had spoken to the POs and told them that CW1 was going to have information for them regarding another ripoff.

## C.     Wiretap of Doroniuk Phone and Ripoff of Storage Unit on 8/18/2006

10.     On 8/3/2006, Chief Judge James F. Holderman signed a court order authorizing the interception of wire communications to and from Doroniuk Phone, a cellular phone used by RICHARD E. DORONIUK.  Interception began on 8/4/2006.  (On 9/1/2006, Chief Judge Holderman signed a court order authorizing the continued interception of wire communications to and from Doroniuk Phone.  On 9/28/2006, Chief Judge Holderman signed an additional court order authorizing the continued interception of wire communications to and from Doroniuk Phone.)

11.     After the initiation of the wiretap on Doroniuk Phone, CW1 provided information to CROSS (again at the direction of the FBI) about a second storage unit containing drugs and drug proceeds.  The FBI had placed $18,100 in this storage unit.  On 8/18/2006, officers later identified as DORONIUK, SHAMAH, Officer A, Officer C, Officer D, and Officer D's partner

5

(Officer E), went to the storage unit with a search warrant.  Calls intercepted over Doroniuk

Phone on 8/18/2006 reflect that DORONIUK and SHAMAH turned in $7,000 as evidence

recovered from the search, and that they stole the remaining $11,100.  CPD records obtained

from CPD-IAD confirm that only $7,000 was turned in from this search.  Calls intercepted on

Doroniuk Phone on 8/19/2006 reflect that DORONIUK gave CROSS a portion of the stolen

funds as CROSS' share of the ripoff proceeds.  CROSS then gave CW1 $400 from CROSS'

share of the proceeds.

**D.      Other Ripoffs Planned by Co-Conspirators**

12.      In addition to the ripoffs conducted at the undercover storage units on 6/13/2006

and 8/18/2006, calls intercepted over Doroniuk Phone revealed various additional activities of

the co-conspirators, such as (1) plans by DORONIUK and SHAMAH to ripoff the storage unit

owner again, with the assistance of CROSS; and (2) plans by DORONIUK and SHAMAH to

conduct a home invasion, with the assistance of Individual A.  Calls between CROSS and CW1

also provided information regarding these matters, as detailed further herein.

**III.     PROBABLE CAUSE**

**A.      The 6/13/2006 FBI Storage Unit Ripoff**

**1.      Summary of Events**

13.      During a consensually recorded telephone call on 6/12/2006, CW1 provided

information to CROSS about a storage unit at the Grand-Pulaski Self Storage facility in Chicago.

CW1 told CROSS that the unit contained drugs and drug proceeds.  Agents acting in an

undercover capacity had previously rented the storage unit, and placed $20,000 in a black

backpack-type bag that was placed inside the storage unit.  On 6/13/2006, POs (believed to be

6

DORONIUK and SHAMAH) took CROSS to court to serve as the informant for a search warrant

for the storage unit. Thereafter, officers later identified as DORONIUK, SHAMAH, Officer A

and Officer B, went to the storage unit with a search warrant. Surveillance agents observed these

POs enter and exit the storage facility carrying bolt cutters. Recorded and unrecorded telephone

calls between CROSS and CW1 on 6/13/2006 revealed that the POs told CROSS there was

nothing (no drugs or drug proceeds) inside the unit. When the FBI later returned to the storage

facility, they were told by the manager on duty that the police had entered the unit with a search

warrant. When agents accessed the unit, they observed that the $20,000 was no longer in the

storage unit. According to CPD records obtained from CPD-IAD, no money was ever turned in

by the POs from the search.

### 2.    Telephone Calls Between CROSS and CW1 Preceding Storage Unit Ripoff by POs on 6/13/2006

Initial Conversations Regarding Previous Ripoffs
and CROSS' Request for Assistance from CW1

14.    On 4/10/2006, CW1 told agents that CW1 was recently contacted by CROSS,

who CW1 knew from CW1's former drug-related activities. CROSS told CW1 about drug

related ripoffs done by some CPD POs. Specifically, CROSS said that CROSS' girlfriend,

Individual B, was involved with two CPD POs (later determined to be DORONIUK and

SHAMAH, as discussed below). These POs used Individual B as the informant for search

warrants executed at locations believed to be used by drug dealers. CROSS explained to CW1

that after a search warrant was obtained, the POs stole money and/or drugs from the search

location. In exchange for her information about ripoff targets, Individual B was given a share of

the proceeds from the "rip." During the telephone conversation between CROSS and CW1,

7

which was unrecorded, CROSS asked CW1 if CW1 could provide the names of drug dealers that the POs could rob.

15.     On 4/10/2006, CW1 made a consensually recorded telephone call to CROSS, who was using Cross Phone. CW1 and CROSS discussed a potential scenario in which the POs could rob a drug dealer. CW1 told CROSS that "old boy ... from outta town" called (a fictitious drug dealer) and that "he be bringing stuff here, droppin' it off and collectin' the money" (the drug dealer would be bringing drugs into town to drop off, and then collecting drug proceeds while in town). CW1 added, "it's gonna be a lot of it" (the drug dealer would have a lot of money). CW1 referred to "them people we was talkin' about ... them police" (the POs). CROSS agreed that "that'll work" (setting up the ripoff) and instructed CW1 "you be doin' the negotiating, eh, somethin' between um, now and Friday, they pick a date" (the POs should pick a date for the ripoff).

16.     After the 4/10/2006 conversation, CROSS contacted CW1 frequently, either in person or on the telephone, and CW1 spoke to CROSS on a number of occasions. Some of these telephone conversations and meetings were not recorded; however, CW1 advised agents of the content of each conversation with CROSS after the conversation occurred.[5] During these unrecorded conversations, CROSS continued to provide information to CW1 about the POs, and asked CW1 to provide the name of an individual and/or a location that the POs could rob (under the pretext of a search warrant). CROSS also told CW1 the POs were calling CROSS,

---

[5]These conversations were not recorded because CROSS called or visited CW1 unexpectedly. Agents did not provide CW1 with a recording device to use on these occasions because there were often other people present at the residence where CW1 is living. As a result, agents were concerned about others learning of CW1's cooperation with the government.

pressuring CROSS for information from CW1. During these telephone conversations, CROSS and CW1 also discussed the share of the ripoff proceeds that they would request from the POs in exchange for providing information about the ripoff target.

17.    During these unrecorded telephone conversations, CROSS also talked further about the previous drug ripoffs he said were conducted by the POs. CROSS told CW1 that the POs continued to use Individual B as their informant for search warrants until she was arrested on or around 5/7/2006; thereafter, the POs used CROSS as their informant.[6] CROSS also told CW1 that on numerous occasions, the POs purchased drugs from CROSS to use in connection with the ripoffs. CROSS told CW1 that CROSS accompanied the POs on some of these ripoffs. CROSS referred to the POs with whom he talked to frequently as "Mike" and "Richie" (who agents later determined to be MAHMOUD SHAMAH, aka "Mike" and RICHARD E. DORONIUK, as discussed further herein). CW1 updated agents about these conversations shortly after each conversation occurred.

Calls Between CW1 and CROSS
Regarding Planned Ripoff To Be Conducted by POs

18.    During the same time period, CW1 made a number of consensually recorded telephone calls to CROSS, who was using Cross Phone. During these conversations, CROSS and CW1 further discussed their plans to coordinate a ripoff with the POs. On 4/21/2006, CW1 made a consensually recorded telephone call to CROSS, who was using Cross Phone. During this call, CW1 and CROSS discussed planning a possible ripoff with the POs. CW1 told CROSS that CW1 wanted to do a "small one" (ripoff of a small quantity of drugs and drug proceeds) with

---

[6]NCIC criminal history records confirm that Individual B was arrested on 5/8/2006.

the POs by first involving some drugs and about $50,000. CW1 added, "then we try them with the big one" (ripoff of larger quantity of drugs and drug proceeds). CW1 told CROSS about a potential ripoff location, and CROSS responded, "I need the right address, that's all" (CROSS needed the address to provide to the POs for the search warrant). CROSS told CW1 that he (CROSS) wanted to get "120" from the upcoming rip, which CW1 understood to mean 120 grams of cocaine from each kilo of cocaine. CW1 told CROSS that CW1 could not get CROSS the "120" from this deal because CW1 would not be "able to handle it" (not be able to deal directly with the dealer). CROSS told CW1 that CW1 needed to "get a top off with the 120" (take 120 grams from each kilo they receive before CW1 transported the drugs to the ultimate customer). CW1 told CROSS to make it "crystal ball clear" to the POs that CW1 needed to get a percentage of the deal.

19.     On 4/21/2006, CW1 made a consensually recorded telephone call to CROSS, who was using Cross Phone. During this call, CW1 and CROSS continued to discuss the possible ripoff to be conducted by the POs. CW1 described this rip as a "quick one" with "just some cash" (only drug proceeds). CROSS agreed, but said, "yeah, but yeah, something else might be there too, though" (there might be drugs at the location, in addition to drug proceeds).

20.     On 5/18/2006, CW1 made a consensually recorded telephone call to CROSS, who was using Cross Phone. During this call, CW1 and CROSS continued to discuss the possible ripoff. CROSS told CW1 that the POs were still asking him (CROSS) for information from CW1 for the ripoff. CW1 told CROSS that the "thing" would be "ready in a minute" (the drugs and drug proceeds for the ripoff would be there soon), but CW1's drug dealer left town. CW1 asked CROSS what he (CROSS) received from the POs for a recent search warrant that he

10

(CROSS) had done for the POs (CROSS previously discussed this search warrant with CW1).

CROSS told CW1 that the POs did not get much out of the house that they searched.  CROSS

added that the POs bought five rocks of crack cocaine from CROSS in exchange for $50, and

that the POs turned the drugs in to the judge in support of the search warrant.

### Setup of Storage Locker By FBI

21.     On May 12, 2006, agents acting in an undercover capacity rented the storage unit

549 at the Grand-Pulaski Self Storage Facility (Unit 549) using a fictitious undercover identity.

On a later date, agents placed, among other items in the unit, $20,000 in a black backpack-type

bag.  Agents put a lock on the door to the unit for which only the FBI had a key.

### Calls Between CW1 and CROSS Regarding
### Ripoff Location and Contents of Storage Unit

22.     On 6/12/2006, CW1 made a consensually recorded telephone call to CROSS in

which they discussed the specifics for the ripoff.  CW1 provided CROSS with information about

a storage unit.  CW1 told CROSS that the storage unit (Unit 549) was used by CW1's drug

supplier.  After CW1 provided the name of the drug dealer (which was the fictitious undercover

identity), the storage unit number, and the location of the storage unit, CROSS asked, "But, but

there's something in there now. . .?" (asking about drugs and cash in the unit).  CW1 responded,

"Yeah, right, right, there's something in there now..."  CW1 described the items in the unit in

detail, and explained where the drugs and money would be kept within the unit.  CW1 told

CROSS that "it's in something like a, uh, you know ... them duffle bag sack."  CW1 added that

"it's a black one" (referring to the black bag containing drugs and/or drug proceeds).  CROSS

repeated, "OK, it's a black one."  After CW1 provided this information to CROSS, CROSS said,

11

"So let me get on top of it.  Let me see of I got the information down right."  CROSS proceeded
to repeat the unit number of the storage unit (Unit 549) and the location of the facility.

23.     During a second recorded conversation between CW1 and CROSS on 6/12/2006,
CROSS told CW1, "I'm calling you back letting you know they off today but they going to take
care of it tomorrow" (the POs were not working that day, but they would conduct the ripoff the
next day).  CROSS told CW1 that the PO was doing "research" to "find out what, what he need
to do to go up in there" (DORONIUK was obtaining information about the storage facility).
CROSS also explained that the POs wanted to confirm that the storage facility was in the City of
Chicago (i.e., within the jurisdiction of CPD).  Specifically, CROSS said that "they wanted to
know ... whether I'm talking about a public storage thing here in Chicago."  CROSS added that
he told the POs, "'yeah, its on Grand and Pulaski,' and he (the PO) said that's good, stay in the
city."  CROSS told CW1 that the PO CROSS spoke to was "calling people to see what he have to
do to make that happen" (DORONIUK was obtaining information about the storage unit location
and gathering a team to conduct the ripoff).  Unbeknownst to CROSS, the storage unit was
rented by the FBI, and contained $20,000 in government funds in a black backpack type bag.

### 3.     Telephone Calls Between CW1 and CROSS on 6/13/2006 Regarding Ripoff of Undercover Storage Unit by POs

24.     On 6/13/2006, CROSS called CW1 and told CW1 that the POs were taking
CROSS to serve as the informant for the search warrant to be obtained for the storage unit.
CROSS called CW1 throughout the day to provide updated information about the status of the
search warrant and the estimated time that the POs would be arriving at the unit.  These calls
were not recorded; however, CW1 advised agents of the content of each call shortly after each

12

call.

25.    At approximately 1:29 pm on 6/13/2006, CW1 made a consensually recorded telephone call to CROSS, who was using Cross Phone. During this call, CROSS confirmed that he was "in the back of the car" (the POs' car) and said that they "gonna drop me off before they go by and take care of they business" (the POs were going to drop off CROSS before they went to do the ripoff at the storage facility). CROSS said that "they gonna be there about 2:00" (the POs would be at the storage facility at about 2:00 pm).

26.    That same day at approximately 1:52 pm, CW1 made another consensually recorded telephone call to CROSS, who was using Cross Phone. CROSS said that "they rollin' now" (the POs were on their way to do the ripoff). CW1 told CROSS that "I know it's 40 in there" ($40,000 in the storage unit).

27.    In another consensually recorded telephone call to CROSS, a few minutes later, CROSS told CW1 that he (CROSS) "told 'em man just the test run" and "we got a lot more of this where that came from" (CROSS and CW1 would provide the POs with more ripoff targets if this first ripoff was successful). CROSS added that "I told them I said it might be six bricks" and "we got to have two of them" (CROSS told the POs that there might be six kilograms of cocaine in the storage unit, and that he and CW1 should get two kilograms in exchange for their assistance). CROSS also said "I told him it was there" (told the POs about the drugs in the unit). CROSS added that "they talkin about how they couldn't sleep last night ... cause they want to get this" (the POs couldn't sleep because they were excited about the ripoff).

13

### 4.    Surveillance of 6/13/2006 Ripoff and Corroborating Telephone Calls

Surveillance Team Observations at Storage Facility on 6/13/2006

28.    At approximately 3:00 pm on 6/13/2006, FBI surveillance agents observed four

then unidentified individuals enter the Grand-Pulaski Self Storage facility and then later leaving

the storage facility. The surveillance agents observed that the individuals leaving the facility

were carrying bolt cutters. Surveillance agents photographed all four individuals. Surveillance

photographs were compared to photographs maintained by CPD-IAD. The four individuals

depicted on the surveillance photographs were identified as RICHARD E. DORONIUK, Officer

A, Officer B, and MAHMOUD SHAMAH. Surveillance agents saw that three of the officers,

DORONIUK, Officer B, and SHAMAH, were wearing ballistic vests and had visible weapons.

In addition, surveillance agents observed that DORONIUK's CPD badge was visible on his belt.

Surveillance agents observed and noted the license plate numbers of the two vehicles the POs

were seen in while both arriving at and leaving the storage facility. CPD-IAD confirmed that

both vehicles were CPD tactical vehicles assigned to the 22nd District.

Calls Between CW1 and CROSS Regarding the Ripoff Following the Ripoff

29.    Shortly after the surveillance team informed agents that the four individuals left

the storage facility, CW1 contacted the agents. CW1 informed agents that CROSS just called

CW1, and told CW1 that the POs went to the facility but found no cash or drugs. This

conversation between CW1 and CROSS was not recorded. At 3:19 pm on 6/13/2006, CW1

placed a consensually recorded telephone call to CROSS. CROSS reiterated that "they looked

everywhere" (the POs searched everywhere in the storage unit) but did not find any money.

CROSS described the storage unit as being "as big as two little bathrooms" with a lock "like a

14

garage," and described items in the storage unit, such as a table, two chairs, a microwave, "speakers and a little radio or something," and other items. I know these descriptions to be accurate because I was present when these items were placed inside Unit 549. CROSS also provided other accurate information about the storage unit that had not been provided to CW1 by the FBI. Specifically, CROSS mentioned that there was a "newspaper that had a June 8 date on it" in the garbage bag in the unit, and that the garbage bag contained "kids' clothes and a mattress." CROSS could not have known the information about the newspaper without being in the unit or speaking to someone who had been inside of the unit. In addition, CROSS told CW1 that "they (the POs) give me the play by play description on what happened."

### Undercover Investigation at Storage Unit After 6/13/2006 Ripoff

30.    On 6/16/2006, when FBI agents later returned to Unit 549 at the Grand-Pulaski Self Storage facility, they observed that the lock originally placed on the unit door by agents was no longer on the unit; a different lock had been placed on the unit. (No one other than the agents had a key to the original lock.) FBI agents acting in an undercover capacity went to the storage facility and spoke to an individual who identified himself as the manager of the storage facility. The manager told agents that the police had been in the unit and that they had a search warrant. The manager also said that the police had placed a lock on the unit. The manager said that he had a copy of the search warrant but could not give it to the undercover agents. When the undercover agents asked the manager if the police had taken anything, he said that he only saw them take a black backpack type bag out of the unit. The description of this bag is consistent with the bag in which the $20,000 was placed. After this discussion with the manager, agents placed their own lock (again for which only the FBI had the key) on the unit. Agents did not

15

remove the lock believed to have been put on the door of Unit 549 by the POs.

31.    On 6/23/2006, agents went to the Grand-Pulaski storage unit. Both the lock placed on the door of Unit 549 by the FBI and the lock believed to have been put on the door of Unit 549 by the POs were still present. Agents then cut off the POs' lock and unlocked their own lock. When they entered Unit 549, agents observed that the black bag containing the $20,000 in cash (that the agents previously placed in the unit) was no longer there.

### 5.    Search Warrant Information and Inventory Information Provided by CPD-IAD

32.    CPD-IAD obtained a digital copy of the search warrant data form prepared in connection with the 6/13/2006 search.[7] This document was obtained by CPD-IAD from internal CPD electronic databases, and provided to the FBI. RICHARD E. DORONIUK, Officer A, and MAHMOUD SHAMAH were listed as the CPD personnel participating in the search. DORONIUK was listed as the affiant, and Officer A was listed as the search team supervisor. Officer B was not listed on the search warrant data form; however, he was observed by surveillance agents at the search location.

33.    As reflected on the digital search warrant data form obtained from CPD's electronic databases, the portion of the form completed following the execution of the search

---

[7] A search warrant data form is a two-part document prepared in accordance with CPD orders regarding searches. Part I of the form is completed before the search warrant is obtained, and includes general information regarding the search warrant, including the names and assignments of CPD personnel assigned to the search team, and the object of the warrant (e.g., a controlled substance). Part I of the form is a prerequisite to the execution of a CPD search warrant. Part II of the form is completed after the execution of the search, and includes information about the location searched, and property recovered during the search (i.e., whether property was recovered, whether an arrest was made, etc.). The search warrant data form therefore provides detailed information regarding a CPD search.

indicates that no property was recovered in the search.  In addition, CPD-IAD provided agents

with copy of the Vice Case Report submitted by DORONIUK and SHAMAH in connection with

the 6/13/2006 search.  The narrative portion of the Vice Case Report states that "A search of unit

turned negative results" (i.e., no property was recovered during the search).  The inventory report

section of the Vice Case Report was left blank. (If there was an inventory report associated with

the incident, the inventory report number should be listed in this section.)  On 10/5/2006, CPD-

IAD queried CPD's internal electronic database to determine whether any cash was inventoried

by DORONIUK, Officer B, Officer A, or SHAMAH in connection with the 6/13/2006 search.

The CPD records division assigns a records division (RD) number to each reportable incident

responded to by CPD.  As of 10/5/2006, there were no inventories associated with the RD

number HM411775, the RD number assigned to the 6/13/2006 search.  In addition, as of

10/5/2006, there were no CPD inventories associated with search warrant number 06SW5539

(the search warrant number assigned to the 6/13/2006 search at the storage facility).  As a result,

based upon CPD internal electronic records, I believe that no cash has been inventoried by

DORONIUK,  Officer B, Officer A, or SHAMAH in connection with the first staged ripoff at the

storage facility.

**B.**     **The 8/18/2006 FBI Storage Unit Ripoff**

      **1.**     **Summary of Events**

      34.     On 8/17/2006, CW1 placed a recorded telephone call to LARRY CROSS.[8]

---

[8]Each consensually recorded telephone call between CW1 and CROSS referenced herein
regarding the 8/18/2006 ripoff and subsequent events was placed to or received from (773) 876-
2945, a cellular telephone subscribed to in the name of Larry Cross.  (CROSS had discontinued
use of Cross Phone on 7/26/2006.)  Agents observed CW1 dial the phone number (773) 876-
2945 for each recorded call made by CW1 with CROSS.

During this call, CW1 provided detailed information about a storage unit that could be ripped off by the POs. Specifically, CW1 told CROSS that there were at least "30 stacks" ($30,000) and some "work" (drugs) in storage unit 111 at the self-storage facility located at Grand and Kilbourn in Chicago, Illinois (Unit 111). CW1 provided the name of the drug dealer who rented the storage unit (a fictitious undercover identity used by agents to rent the storage unit). It was the same name provided to CROSS before the robbery of Unit 549 at the Grand-Pulaski Self Storage facility on 6/13/2006. (CW1 told CROSS that it was the same drug dealer that he/she and CROSS set up for the first ripoff with the POs.) CW1 told CROSS that the money was in a cardboard box sealed with duct tape, and that the box was in a garbage bag.

35.     Unbeknownst to CROSS, agents acting in an undercover capacity rented Unit 111 on 7/31/2006. On 8/4/2006, agents placed $18,100 of government funds (consisting of $100 bills and $50 bills) in the cardboard box. Some of the cash was bundled in rubberbands, some of the cash was wrapped in a newspaper, and some of the cash was loosely scattered in the box. During the 8/17/2006 recorded telephone call, CW1 told CROSS that CW1 did a drug deal at Unit 111 that day, and that the drug dealer would be moving his drugs and drug proceeds out of the unit over the weekend. Therefore, the POs needed to go to Unit 111 the next day (Friday, 8/18/2006). Agents (acting in an undercover capacity as associates of the fictitious drug dealer renting the unit) accessed Unit 111 three times on 8/17/2006, by typing in an access code specific to Unit 111 (which was provided to undercover agents by the storage facility when Unit 111 was rented by the undercover agents).

36.     During the evening of 8/17/2006, numerous calls were intercepted pursuant to the Title III wiretap on Doroniuk Phone. During these calls, CROSS passed on the information to

DORONIUK about Unit 111. DORONIUK then called his partner, SHAMAH and told SHAMAH about the ripoff location. During these conversations, DORONIUK and SHAMAH talked about stealing the cash, and also made references to the first ripoff of the drug dealer (i.e., the same fictitious undercover name). DORONIUK and SHAMAH had conversations about how to make sure nobody else went into the storage unit with them during the search. SHAMAH and DORONIUK told Officer A, a CPD sergeant, that they did not want anyone else to go on the search. However, Officer A told DORONIUK that he (Officer A) needed to follow procedures which required that a Lieutenant be present for all searches outside of their District. (DORONIUK and SHAMAH are assigned to the 22nd District, the storage facility is in the 25th District.) DORONIUK also called Individual A that evening and told her that after the search he would buy her a diamond necklace.

37.    During the evening hours of 8/17/2006, DORONIUK and SHAMAH continued to talk about the specifics of the search. They also talked about how to make sure they did not get caught. For example, they discussed wearing baggy clothes and burning the bag (that contained any cash) like they did the last time (after the ripoff on 6/13/2006). There were several conversations about how SHAMAH would request that Officer A keep the Lieutenant (Officer C) outside of the storage unit, and how DORONIUK would ask Officer A to "turn the other cheek."

38.    The next morning, surveillance agents observed CROSS get into a CPD vehicle (later determined to be driven by DORONIUK) at approximately 8:15 am. Surveillance agents later observed the same vehicle arriving at the Cook County courthouse. DORONIUK and CROSS were observed entering the courthouse; CROSS and SHAMAH were observed exiting

the courthouse and getting back in the vehicle.  At approximately 9:23 am, agents conducting

surveillance in the vicinity of the Grand-Kilbourn Self Storage facility observed DORONIUK

and SHAMAH arrive in the CPD vehicle at a nearby warehouse parking lot.  Officer A and

Officer C (the CPD Lieutenant who accompanied the POs on the search), Officer D and his

partner Officer E, were also observed at the scene.  Surveillance agents observed some officers,

including DORONIUK and SHAMAH,  entering the self-storage facility at approximately 9:30

am.  Court-authorized video surveillance recorded some of the events inside Unit 111 including

SHAMAH taking the cardboard box (containing the cash) out of the garbage bag, and

DORONIUK standing near the box while SHAMAH continued searching the unit. Outside of the

storage facility, surveillance agents observed the POs exiting the premises and specifically

observed DORONIUK exiting the facility carrying a cardboard box. DORONIUK and SHAMAH

(riding in the CPD same vehicle) were observed driving away from the Grand-Kilbourn Self

Storage facility.

      39.     Thereafter, surveillance agents were able to loosely follow DORONIUK's vehicle.

Surveillance agents observed, among other things, DORONIUK and SHAMAH parked in the

vicinity of an address on S. Kildare believed to be the home address of DORONIUK's

grandmother at approximately 10:05 am.  As detailed below, a call intercepted on Doroniuk

Phone at approximately 10:04 am indicates that DORONIUK's grandmother was not at home.

After stopping at the Kildare address, DORONIUK's vehicle proceeded to the 22nd District

headquarters building, where DORONIUK and SHAMAH were observed getting out of the

vehicle at approximately 10:30 am, and DORONIUK was observed removing the cardboard box

from the trunk of the vehicle and carrying the box into the building.

40.     Telephone calls intercepted over Doroniuk Phone on 8/18/2006 reveal that DORONIUK and SHAMAH inventoried only $7,000 of the $18,100 originally placed in the cardboard box that was located in Unit 111. As discussed below, the CPD inventory report obtained by CPD-IAD also reflects that $7,000 was inventoried from the search. During the intercepted calls on 8/18/2006, DORONIUK and SHAMAH agreed to each take $5,500 and to give CROSS $1,000 ($500 from each of DORONIUK and SHAMAH). It is not clear what happened to the remaining $100. On the following day, DORONIUK called CROSS and told him that he would meet CROSS to give him something. Surveillance agents observed the meeting between DORONIUK and CROSS at approximately 11:40 am on 8/19/2006. Thereafter, CROSS went to CW1's house and gave CW1 $400 around 4:26 pm that same day. CROSS told CW1 that the POs gave him $800 from their share of the ripoff proceeds. The serial numbers on the four $100 bills given to CW1 by CROSS match serial numbers on four of the $100 bills placed in Unit 111 on 8/4/2006.

## 2.     Calls Prior to 8/18/2006 Regarding Upcoming Ripoff of Drugs and/or Drug Proceeds

41.     Prior to 8/12/2006, CW1 and CROSS had a number of unrecorded calls in which they discussed plans for CW1 again to obtain information about a drug dealer for the POs to rob. They also discussed when CW1 would be able to provide the necessary information to set up a robbery for the POs.

42.     On 8/12/2006, an incoming call to Doroniuk Phone from (773) 876-2945, used by CROSS, was intercepted. DORONIUK answered the phone and said "Larry?" then asked "you got something good?" (did CROSS have any information about potential ripoff targets). Before

CROSS could fully respond, DORONIUK told CROSS to "hold on, I'm gonna give you the phone to Mike real quick." SHAMAH came to the phone and said "what's up Larry?" After some conversation about other matters, CROSS told SHAMAH, "on the work side ... my guy say a ... everything going to be, its gonna be somethin' jumping this week 'cause the people came to town and everything ... you know they got their shit, he say he gonna let me know more details" (CW1 told CROSS that something might happen regarding the upcoming ripoff because CW1's drug dealer was coming to town). SHAMAH asked CROSS "what area that gonna be in?" CROSS said "on the west side, remember ...?" (the first ripoff conducted by the POs based on information from CW1 was on the west side of the City of Chicago on 6/13/2006). SHAMAH said "oh, OK, yeah, yeah, yeah, yeah, I got ..." (SHAMAH remembered the west side ripoff). CROSS continued, "in that storage area, remember that one?" (again referring to the 6/13/2006 ripoff at the storage facility). SHAMAH said "yeah I got you, I know what you're talking about." SHAMAH then said, "get something like that, that would be beautiful" (set up another ripoff like the first storage unit).

CW1 Provides Ripoff Information to CROSS

· 43.    At approximately 1:36 pm on 8/16/2006, CW1 placed a recorded call to CROSS on CROSS' cellular telephone, telephone number (773) 876-2945. CROSS answered the phone. CW1 told CROSS that "we gonna be set for Friday for sure" and that its "gonna be a go" (CW1 would have information regarding the drug dealer that could be ripped off by the POs on Friday, 8/18/2006). CROSS responded by saying that's what we've been waiting for (CROSS has been waiting for CW1 to provide information about the robbery victim because the POs previously promised to give CROSS a share of the robbery proceeds). CW1 again told CROSS that it would

22

be "Friday for sure." CROSS then asked CW1 questions about the location to be robbed. Specifically, he asked CW1 if it was the same place that the POs robbed before (i.e., the storage unit at the Grand-Pulaski Self Storage about which CW1 previously provided information), or if it was a house. CW1 told CROSS that CW1 would tell him (CROSS) tomorrow.

44.     During this conversation, CROSS continued to ask CW1 for more detailed information. CW1 explained to CROSS that CW1 was going to give the necessary information to CROSS the following night. CW1 told CROSS that he/she did not want the POs to have the information too soon, because they might do something without him/her (the POs might rob the location and not give any proceeds to CW1). CW1 further explained that "my people" were "comin' in" (CW1's fictitious drug supplier was coming to town) and that CW1 wanted "to make sure its where it's supposed to be" (CW1 wanted to make sure that there were drugs and/or drug proceeds in the location to be ripped off by the POs). CROSS asked if there would be "skirts" (cocaine) at the location. CW1 told CROSS that "both of them" would be there (i.e., there would be both cocaine and heroin at the location). CROSS did not ask CW1 if there was money at the location.

45.     During this same telephone conversation, CW1 told CROSS, "so look, I'm gonna have everything together for you" and told CROSS that he/she would have "names and everything" (CW1 would have specific information that the POs could include in the search warrant to be obtained for the ripoff location). CW1 told CROSS to "get with them" (the POs) and that "we'll be ready" (CW1 and CROSS would have everything that the POs needed to enter the location with a search warrant and then steal drugs and money from the location).

46.     CROSS called CW1 at approximately 11:00 am on 8/17/2006 to discuss the

23

search warrant to be obtained by the POs in connection with the upcoming ripoff. CROSS asked CW1 for information about the location that the POs could rob. CW1 did not provide information to CROSS during this telephone conversation. CW1 told CROSS he/she would call CROSS back that evening with all of the details about the drug dealer to be set up by CW1 and CROSS. This conversation was not recorded; however CW1 advised agents of the content of the call shortly after the call took place.

47.     At approximately 6:42 pm on 8/17/2006, CW1 placed a recorded telephone call to CROSS on CROSS' cellular telephone, telephone number (773) 876-2945. CW1 told CROSS that CW1 met with "those people" (the drug dealer) right after CW1 talked to CROSS that morning. CW1 told CROSS that they (the drug dealer) were at "another one of those places" at Grand and Kilbourn (another self-storage facility like the one ripped off by the POs on 6/13/2006).

48.     CW1 asked CROSS if CROSS had a pencil. After CROSS obtained a pencil, CW1 provided information to CROSS about the storage facility. CW1 told CROSS that the self-storage facility was located at Grand and Kilbourn, and CW1 spelled out "Kilbourn" for CROSS. CW1 told CROSS that the box number was 111 and provided the name used to rent out the storage unit (the name was an undercover identity used by undercover FBI agents to rent the storage unit). CW1 repeated the name again, saying it was "still" under that name (it was the same name used at the other storage facility ripped off by the POs).

49.     CW1 told CROSS that CW1 "went in this one" and that he/she had "seen it with [his/her] own eyes." CROSS acknowledged this information. CW1 added that he/she knew it was "30" ($30,000) plus there's "work" (drugs) in the storage unit. CW1 explained to CROSS

24

that the money was in a box with duct tape, and that the box was inside of a trash bag. CW1 also told CROSS that they (CW1 and the drug dealer) "weighed stuff up" (weighed drugs) in the unit, and that there were "scales and everything" (drug scales and drug paraphernalia) in there. CW1 told CROSS that he/she did not want him (the drug dealer) to "move it" (CW1 did not want the dealer to take the drugs out of the unit before the POs arrived).

50. CROSS asked about the quantity of drugs and money inside the unit. CW1 said "that's what I put there" (the $30,000) and that there was probably more (probably more than $30,000 in the unit and probably more drugs). CW1 also said that there might be "ten keys of girl" (ten kilograms of cocaine). CROSS asked CW1 how much CW1 wanted as his/her share of the robbery proceeds, and mentioned breaking down the drugs. CW1 responded, "right ... we can break that down" (they could divide up the drugs).

51. CW1 told CROSS that the drug dealer "had one of them old duffel sacks" and indicated that the drugs were in the duffel bag. CW1 told CROSS that they (the POs) "have to do this" (rob the unit) because the weekend was coming up. CROSS agreed. CW1 told CROSS that the POs could not go to the unit too late at night because the facility was only open from 9:00 am to 6:00 pm or 7:00 pm. CW1 repeated that it was one of those storage places at Grand and Kilbourn. CW1 warned CROSS that they (the POs) had to do it (rob the drug dealer's storage unit) tomorrow, and that they can't do it over the weekend because CW1 was afraid that the dealer would "move it" (take the drugs and/or drug proceeds out of the storage unit). CROSS indicated that he would contact the POs immediately. CROSS agreed to call CW1 back after he talked to the POs.

25

## CROSS Provides Ripoff Information to DORONIUK and SHAMAH

52.     At approximately 6:48 pm on 8/17/2006, an incoming call to Doroniuk Phone from (773) 876-2945, used by CROSS, was intercepted. CROSS left a message for DORONIUK stating that DORONIUK needed "to get with me ASP man" (DORONIUK needed to call CROSS as soon as possible) because the drug dealer (CROSS used the name of the undercover identity used to rent Unit 111) was "going on so get with me man" (there would be information about the drug dealer's stash location).

53.     At approximately 7:04 pm, an outgoing call from Doroniuk Phone to CROSS was intercepted. CROSS told DORONIUK that "my guy just called me" and that his (CROSS') guy (CW1) "said he took him 30 stacks today, he said there was some more there, and he says about 10 thangs there, right?" (CW1 took $30,000 to the drug dealer that day, there was probably more money, plus ten kilograms of cocaine). DORONIUK asked, "where at?" and CROSS responded, "uh, it's a different location, but ... he told me to talk with y'all first. Listen, its still at ... a storage place. Its under his name, but he say ... he say man, he said you know I been telling him about how shit been goin' man he say man ... if its just 30 there, ... it gotta be did tomorrow" (the storage unit was rented under the same name as the first storage unit ripped off by the POs, and the ripoff of the new location needed to occur the next day). DORONIUK said, "oh, its gonna be there tomorrow?" (the drugs and/or drug proceeds would be in the unit tomorrow). CROSS said its got to be, because "it's there now." CROSS repeated that "he" (CW1) said its got to be "did" tomorrow. DORONIUK said alright, and that CROSS needed to know for sure. DORONIUK added that he had the drug dealer's "information still" (from the first search warrant on 6/13/2006) and "that's no problem, I have his info and everything."

26

54.     During the same conversation, DORONIUK then asked CROSS "do you know where the storage facility is?" CROSS said he did not have the address, but "all I know, is like I did before ... what corner its on." DORONIUK asked "is it the same one?" (was it the same storage unit where the first ripoff occurred). CROSS told DORONIUK it was at a new location at Grand and Kilbourn. DORONIUK said he knew where that was. CROSS told DORONIUK that the unit number was 111. DORONIUK repeated the number 111. DORONIUK told CROSS that he was working the next morning. CROSS said "yeah definitely, ... got to do it man" because "Dude that put me up on it said he took 30 'ks' there, you know, today" (CW1, who provided the information to CROSS, told CROSS that he/she took $30,000 to the unit that day) and that he said there was more money. CROSS started to say something about a black bag. DORONIUK interrupted CROSS to tell him that "this time" he'll take a camera and film the shit while he's doing it so CROSS could see it for himself. CROSS asked if they needed a search warrant to go in there because it's another unit. CROSS said "all you got to do is go in there with some clippers" (the POs could simply break into the unit without a search warrant). DORONIUK said "if I go in there, if I go in there, and I get in this time and I know of another unit, I'll just clip it" (if there is more than one unit rented by the subject of the search warrant, DORONIUK would clip off the locks on the other units). DORONIUK told CROSS he had to put the unit number "on there for sure" (on the search warrant) CROSS said the one to put on there is 111.

55.     During the same conversation, DORONIUK told CROSS he would "type it up" (prepare the search warrant) tonight with unit 111 on it. CROSS said "this got to be did" (the POs needed to ripoff the drug dealer) because "he" (CW1) took care of his business today, but "he" was a runner for people and "he took him 30 grand today" (CW1 took $30,000 to the drug dealer

that day). DORONIUK confirmed Grand and Kilbourn and asked if the place was "closed at night like the other one" (the first storage facility ripped off by the POs was closed at night). CROSS told DORONIUK it closed at 7:00 pm or 7:30 pm. CROSS said that no one can get in at night, but "they" (the drug dealer who rented the unit) were coming back over the weekend. CROSS added that "he" (CW1) said it's in a black bag, that he put some stuff in a box with scales and everything. CROSS mentioned that there was duct tape. CROSS confirmed the name on the unit. DORONIUK said, "alright, I'm gonna do this."

DORONIUK and SHAMAH Plan the Ripoff

56.     At approximately 7:08 pm on 8/17/2006, an outgoing call from Doroniuk Phone to (773) 615-7900, used by SHAMAH, was intercepted. DORONIUK told SHAMAH he had "good news but we gotta do this tomorrow man." SHAMAH said alright. DORONIUK told SHAMAH that he just got off the phone with CROSS. He then told SHAMAH, "storage facility, [name of undercover identity] again. Fuck it, I don't give a fuck" (CROSS provided information about the same drug dealer ripped off by DORONIUK and SHAMAH once before, and DORONIUK wanted to rob him again). DORONIUK said CROSS told him the place was on Grand and Kilbourn and asked SHAMAH, "remember we went on Grand to Pulaski?" (the location of the first storage facility where the POs conducted a ripoff). SHAMAH said yeah. DORONIUK did a search on the internet and found the storage facility at Grand and Kilbourn, and CROSS said that was not it "the first time" (the first ripoff). DORONIUK told SHAMAH that CROSS said the place is closed for the night, and "he put fucking 30 keys in there right now, and he won't be able to get it until tomorrow" (DORONIUK mistakenly understood from CROSS that there was 30 kilograms of narcotics in the unit). DORONIUK said CROSS gave him the unit number and

28

everything. SHAMAH asked "is there any cash in there?" (any cash in the storage unit). DORONIUK responded, "that's what he said. He says there's scales, a black bag with fuckin' money, he says 30 kilos" (CROSS said there was cash in the unit, along with drug scales, a bag with money, and 30 kilograms of narcotics).

57.     During the same call, DORONIUK told SHAMAH that CROSS talked about the money, and that he (DORONIUK) said to CROSS, "you know what, I'll do it. I said I'll do it because my sergeant ain't there tomorrow. I'll fuckin' do what I gotta do" (DORONIUK would steal the money). SHAMAH said "yeah, but who's gonna be with us tomorrow?" (who would be supervising them tomorrow). DORONIUK said he needed to get the information back, but "it can only be me, you and somebody else going. That's it. You know, like one sergeant" (DORONIUK only wanted one sergeant to go to the storage unit with DORONIUK and SHAMAH). DORONIUK continued, "I mean, fuck it man, I don't need anybody else going with us" (DORONIUK did not want other people to be inside the ripoff location with him and SHAMAH). SHAMAH said he knew.

58.     DORONIUK and SHAMAH then discussed the hours that the storage facility was open, the unit number and the name of the drug dealer. DORONIUK also told SHAMAH that the drug dealer was going there to pick up the "shit" (drugs and/or drug proceeds) on Saturday. DORONIUK said "he says it's in there right now and the place is closed, which is great, because he just left there. The place closes at 6:30 or 7:00 ... and its in unit 111" (it was great that the dealer just left because DORONIUK and SHAMAH could search the unit before the drug dealer returned).

59.     During this intercepted call, SHAMAH also told DORONIUK to find out who

29

their sergeant was tomorrow.  DORONIUK said "I'll do it.  I got no problem.  I'll fuckin' do it"

(DORONIUK would do the ripoff no matter who their sergeant was the next day).  DORONIUK

said that a particular sergeant was supposed to be back tomorrow, and SHAMAH responded "I'd

rather do it with [Officer A] man" (SHAMAH would rather do the ripoff with Officer A than with

some other sergeant).  DORONIUK said, "I know, I know what you mean" then added "unless you

do this ... unless you do this ... he'll listen to you.  Unless you ask [Officer A] to come in earlier

and just do it with us" (DORONIUK wanted SHAMAH to get Officer A to act as their sergeant

for the ripoff).  DORONIUK said "if I didn't think" and "the way he ..." (referring again to Officer

A), then SHAMAH interrupted him and said they should work nights.  DORONIUK explained

that the unit was closed at night.  DORONIUK told SHAMAH he would type it up and call

SHAMAH back.

60.     At approximately 7:12 pm on 8/17/2006, an outgoing call from Doroniuk Phone to

a phone used by Officer F, was intercepted.  DORONIUK asked Officer F for the information on

the drug dealer (DORONIUK provided the name of the fictitious undercover identity) from the

warrant and asked to pick it up that night. (Based upon other intercepted conversations, agents

believe that DORONIUK had for an unknown reason given Officer F the file DORONIUK

prepared for the fictitious drug dealer following the first storage unit ripoff; therefore,

DORONIUK needed Officer F to give him the information.)  DORONIUK told Officer F, "I need

that thing tonight" because "tomorrow morning I want to do it" (DORONIUK wanted to execute

the search warrant the next morning).  Officer F said he would see what he could do.

### Calls with DORONIUK, Officer A and SHAMAH Regarding the Search

61.     At approximately 7:14 pm on 8/17/2006, an outgoing call to Officer A was

intercepted on Doroniuk Phone. DORONIUK asked Officer A who their sergeant would be in the morning. Officer A said it would be the Lieutenant. DORONIUK was upset and said he wanted to do a warrant in the morning. He wanted Officer A to be the sergeant for them, and said "I don't want to take any fuckin sarge" (DORONIUK did not want to do the ripoff with an unknown sergeant present). DORONIUK explained that there was supposed to be 30 kilos of heroin at Grand and Kilbourn, unit 111, with scales and drugs. Officer A told DORONIUK he would call Officer C (a CPD Lieutenant) and call DORONIUK back. DORONIUK told Officer A that they only needed DORONIUK, "Mike" (SHAMAH) and a sergeant (DORONIUK did not want any other POs present during the search).

62.    DORONIUK called SHAMAH back at approximately 7:17 pm. This conversation was intercepted on Doroniuk Phone. SHAMAH told DORONIUK to explain to Officer A that DORONIUK and SHAMAH could do the search alone since it was a public storage unit, not a house.

63.    At approximately 7:19 pm, DORONIUK called Officer A back.   This conversation was intercepted on Doroniuk Phone. DORONIUK asked Officer A, "you remember how we went before?" (did Officer A remember how they staffed the search for the first ripoff). Officer A said yeah. DORONIUK asked Officer A if they could go without a sergeant. Officer A said no, and DORONIUK got upset. Officer A told DORONIUK he would be willing to come in to work in the morning for it. He said he would call DORONIUK back after he talked to Officer C.

64.    At approximately 7:20 pm, an outgoing call from Doroniuk Phone to (773) 615-7900, used by SHAMAH, was intercepted. DORONIUK told SHAMAH that Officer A was

willing to come in and do the search and have it be the three of them (DORONIUK, SHAMAH and Officer A). They talked about getting a judge to sign the warrant that night. SHAMAH asked if Officer A was going to go with them on the search. DORONIUK said, "yes, its fuckin perfect man." DORONIUK told SHAMAH that he was waiting for the file he used before on the drug dealer (DORONIUK was referring to the fictitious undercover name) from Officer F. SHAMAH asked DORONIUK if DORONIUK mentioned to Officer A that there might be money in the unit. DORONIUK said "I didn't tell him anything ... don't even talk on the phone about that shit. If tomorrow you want to tell him..." SHAMAH said he knew how to handle mentioning money to Officer A.

65.    DORONIUK received an incoming call on Doroniuk Phone from Officer A, at approximately 7:24 pm. Officer A told DORONIUK that Officer A needed to talk to the Lieutenant and the Commander about the warrant because it was outside of their district. DORONIUK said "last time ... did we, did we have to do that before?" (did they have to notify the Lieutenant and Commander before the search at the other storage facility). Officer A said no, but he was recently reprimanded for not alerting management for a warrant outside of the district. DORONIUK said, "just tell the Commander its for me." Officer A said he would, and that once the Commander knew it was not for Officer D and another name (which was unintelligible) it should be fine. DORONIUK said it was just a storage box, and it would just be "three of us, that's it" (just DORONIUK, SHAMAH and Officer A).

66.    DORONIUK called SHAMAH again at approximately 7:43 pm. This call was intercepted on Doroniuk Phone. They talked about the location of the storage facility, and the drugs that would be inside the storage unit. DORONIUK said CROSS was sincere about this

32

information. DORONIUK told SHAMAH "it would beautiful" if he could just get this thing (the ripoff) done.

### Call From DORONIUK to Individual A About the Upcoming Ripoff

67.     At approximately 7:46 pm, an outgoing call from Doroniuk Phone to Individual A was intercepted. DORONIUK told Individual A that he was working on a warrant. He told her that in the morning "we go there, and we hit it, maybe you and I will be ... I'll buy you a diamond necklace or something" (DORONIUK would use money stolen from the search location to buy something for Individual A).

### Additional Calls Between DORONIUK and CROSS, SHAMAH, and Others

68.     At approximately 7:58 pm, an outgoing call from Doroniuk Phone to (773) 876-2945, used by CROSS, was intercepted. DORONIUK asked CROSS if CROSS could go with DORONIUK tonight to get the warrant signed. CROSS agreed. DORONIUK told CROSS, "I'm gonna tell ya who's gonna go with me tomorrow, if we do this. It's gonna be me, 'Mike' [SHAMAH], and one other supervisor and he knows not to come in. So, whatever we see, we're gonna, whatever there is, you're gonna get uh, you know, a cut" (DORONIUK and SHAMAH would go in the unit alone, and would give CROSS a portion of the robbery proceeds). CROSS said, "a cut, OK, OK, that's all I needed to know." DORONIUK said, "I'm not taking five guys with me, I'm not taking three guys, its just gonna be me and Mike [SHAMAH] and bolt cutters." DORONIUK reconfirmed the name and address for the storage unit. He told CROSS that if he could find a judge that night, they would meet him in a parking lot somewhere and sign it (the search warrant) in the parking lot.

69.     At approximately 8:29 pm, an incoming call to Doroniuk Phone from Individual C

was intercepted. The conversation began with Individual C asking DORONIUK if he wanted a picture of it (the storage facility) or if it can be a satellite picture. The two continued to discuss how to obtain photographs of 4500 W. Grand Avenue (the location of the Grand-Kilbourn storage facility). Another conversation between Individual C and DORONIUK about photographs of 4500 W. Grand Avenue was intercepted at 8:33 pm. A third conversation was intercepted at 8:41 pm regarding the same topic. During the third conversation, DORONIUK told Individual C that he was getting his file from Officer F.

70.     At approximately 8:54 pm, an outgoing call from Doroniuk Phone to Individual A's phone was intercepted. DORONIUK told Individual A, "wish me luck on this thing" (wish him luck with the ripoff). Individual A said, "yeah, that's a big one" (the location would have a lot of drugs and/or drug proceeds). DORONIUK agreed, and said "you know what I'm going to be sayin' when I, before I cut that little lock on the gate?" Individual A asked what. DORONIUK said "Mama needs some new dresses" (DORONIUK would use money stolen from the search location to buy things for Individual A). They laughed and Individual A told DORONIUK to call her and let her know what they (the POs) find. DORONIUK told Individual A she was the first person he would call. Individual A asked if "Mike" (SHAMAH) was helping DORONIUK with this. DORONIUK responded that SHAMAH did not know how to type these things up, and said "you know what, I'm gonna get it back don't worry." He then told Individual A "you know, like you know, I get my ... I'm gonna charge him for this" (DORONIUK would take a larger portion of the robbery proceeds as payment for typing the search warrant).

71.     At approximately 9:55 pm, DORONIUK called SHAMAH. This call was intercepted on Doroniuk Phone. SHAMAH asked DORONIUK "what did Larry [CROSS] tell

34

you was in that place?" (in the drug dealer's storage unit). DORONIUK responded that CROSS

told him there was heroin. SHAMAH told DORONIUK that CROSS said it was cocaine

(SHAMAH had a telephone conversation with CROSS after DORONIUK talked to CROSS).

DORONIUK said, "whatever, it doesn't matter at this point" (DORONIUK did not care whether it

was cocaine or heroin in the storage unit). SHAMAH said there's not 30 of them (kilos) in there

(there was not 30 kilograms of cocaine in the unit), "there's over 30 grand in there" (there was

over $30,000 in the unit). DORONIUK said "what?!" SHAMAH said "your guy did not take

him, that guy did not take him 30 keys, he said 30 stacks." SHAMAH said "it's not - 30 stacks

means 30 grand" ("30 stacks" means $30,000). DORONIUK said "oh boy." SHAMAH repeated

that there were more than "30 stacks" (more than $30,000) in there. Then SHAMAH said there's

about 40 grand in there ($40,000 in the storage unit) and at least 10 to 15 kilos (10 to 15

kilograms of cocaine). DORONIUK said "if that's there Mike, leave it fuckin be. You leave that

shit ... if you see the kilos, fuck it, leave it there ... you look for the stacks" (DORONIUK wanted

SHAMAH to look for the money and ignore the drugs). SHAMAH asked DORONIUK to

explain what he meant. DORONIUK said "if there's 10 to 15 good, but your ass is to look for the

stacks" (DORONIUK again instructed SHAMAH to look for the money in the unit). SHAMAH

told DORONIUK that they were supposed to be in the same spot (the money and the drugs would

be in the same location within Unit 111). DORONIUK said, then "if you want me to load up on

that, I will" (DORONIUK offered to locate and take the money). DORONIUK told SHAMAH

that SHAMAH needed to keep Officer A and the Lieutenant outside (keep Officer A and Officer

C outside of the storage unit during the ripoff). DORONIUK added that he only wanted himself

and SHAMAH in the storage facility. SHAMAH said if it's both in the same spot, he (SHAMAH)

would open it up, say "it's here," then take it outside to "see if this guy's outside" and throw it in the trunk (SHAMAH would pretend to look for the drug dealer outside of the facility as an excuse to take the money out of the location). DORONIUK said he was going to get the warrant approved then he would come see SHAMAH that night.

72.    At approximately 10:12 pm, an incoming call from Individual A to Doroniuk Phone was intercepted. During this call, DORONIUK explained to Individual A that they just arrested five Chicago cops for stealing $1 million in a suitcase. He said that they took the money out of the suitcase, then left the suitcase in their car with their fingerprints on it. DORONIUK called the five cops "stupid." Individual A told DORONIUK to be careful doing stuff like that (be careful stealing money). DORONIUK replied that he was careful. Individual A said, yeah, don't get caught (don't get caught stealing money).

73.    At approximately 11:07 pm, DORONIUK called CROSS. This call was intercepted on Doroniuk Phone. DORONIUK asked if CROSS could go to court in twenty minutes. CROSS told DORONIUK, "we gotta do this though you know" (they needed to do the ripoff). DORONIUK said, "yeah, its for you and me" (DORONIUK would steal drugs and/or drug proceeds for himself and for CROSS).

74.    At approximately 11:33 pm, SHAMAH called DORONIUK. This call was intercepted on Doroniuk Phone. DORONIUK told SHAMAH that he could not get a judge (to sign the warrant) that night. He also told SHAMAH that they needed to be at the station early the next day, and that Officer D and Officer E were coming in at 5:00 am, because Officer C instructed them to do so. They talked about which court to go to in the morning, because they needed to go early. DORONIUK told SHAMAH he was going to pick up CROSS at about 8:30

36

am, then they were going to Branch 35-38 before the judge goes on the stand. Then he planned to dump CROSS off, and then "go there" (go to the storage facility).

### DORONIUK and SHAMAH Discuss How to Steal and Conceal the Cash

75.    During the same conversation, SHAMAH told DORONIUK that they needed "to think of something" (come up with a plan for taking the money) then told DORONIUK to "please, please, please wear baggy clothes and shit like that" (wear baggy clothes to conceal the stolen funds). DORONIUK said he was going to. SHAMAH said "I'm getting that ... we need that, we both need that" (SHAMAH and DORONIUK need the robbery proceeds). DORONIUK said, "I know." SHAMAH said he would talk to Officer A the next day. DORONIUK told SHAMAH, "you need to pull him [Officer A] aside" and asked SHAMAH to keep the Lieutenant "out" (SHAMAH needed to talk to Officer A in private about not letting Officer C inside the storage unit while the ripoff was in progress). DORONIUK continued to say that he already told Officer D and Officer E "please don't come in ... we'll show you what we got after ... look I don't want anybody in there." SHAMAH asked DORONIUK what Officer D and Officer E said about that. DORONIUK said "he" respected that. SHAMAH said he would talk to the Lieutenant and "keep him outside or something." DORONIUK said he didn't care if Officer A was in there, because DORONIUK would ask Officer A to "turn the other cheek" (DORONIUK would ask Officer A to ignore the theft of drug proceeds by DORONIUK and SHAMAH).

76.    At approximately 11:36 pm, an outgoing call to (773) 876-2945, used by CROSS, was intercepted on Doroniuk Phone. During the call, DORONIUK told CROSS that they would go see the judge in the morning. He told CROSS he would pick CROSS up at 8:20 am. They agreed to meet at the Texaco station at 87th Street and Ashland at 8:15 am.

77.   At approximately 11:40 pm, DORONIUK called SHAMAH. This call was intercepted on Doroniuk Phone. DORONIUK and SHAMAH discussed the five Chicago police officers that were arrested that day. DORONIUK told SHAMAH, "we got to be fuckin' real smart about this shit man, like that last time with the bag" (referring to the black backpack-type bag containing $20,000 that was taken from a storage unit on 6/13/2006 during a search by DORONIUK, SHAMAH and other POs). SHAMAH agreed. DORONIUK said "we need to burn that shit, you know what I mean" (they need to burn the bag that contained the money). SHAMAH said "I know." DORONIUK repeated, "that need to be fuckin burned." He then said "this is ours," and told SHAMAH that he was wearing his size 44 pants tomorrow (referring to baggy pants to conceal the stolen funds). SHAMAH advised DORONIUK to put rubber bands in his pants. SHAMAH said, "I'll even wear two pairs of pants, I don't care" (referring to extra clothing to conceal stolen funds).

### 3.   Calls on Morning of 8/18/2006 Before Storage Unit Ripoff and Related Events

78.   At approximately 7:14 am on 8/18/2006, an incoming call from SHAMAH to DORONIUK was intercepted on Doroniuk Phone. DORONIUK told SHAMAH that he was going to pick up CROSS around 8:00 am and then go to the judge. DORONIUK later asked SHAMAH, "remember when we did that first one ... that first time with [the undercover name used to rent the storage unit at the Grand-Pulaski Self Storage]?" (referring to the ripoff on 6/13/2006). SHAMAH said yeah. DORONIUK said that the Commander never asked about it, and DORONIUK never mentioned it during their meeting the night before. DORONIUK said that Officer A told him not to say anything about it, so he (DORONIUK) didn't. SHAMAH said alright, then who cares.

79.     During the same conversation, DORONIUK told SHAMAH that the Lieutenant and Officer A were out at the place sitting on it (Officer C and Officer A were already in the vicinity of the storage facility). DORONIUK said that he told Officer A that they didn't need Officer D or Officer E or the Lieutenant, all they needed was just you (Officer A), me (DORONIUK) and Mike (SHAMAH). DORONIUK told SHAMAH that SHAMAH needed to talk to Officer A about keeping the Lieutenant out of the building (so that Officer C could not observe the ripoff taking place). SHAMAH asked if Officer D and them (referring to Officer D and his partner Officer E) were there. DORONIUK said that they were out sitting on the joint (Officer D and Officer E were in the vicinity of the storage facility).

80.     At approximately 7:36 am, an outgoing call from Doroniuk Phone to (773) 876-2945, used by CROSS, was intercepted. DORONIUK asked CROSS where CROSS wanted to meet. CROSS said to meet at 87th and Ashland at the Texaco station. DORONIUK suggested the Walgreens. CROSS agreed. DORONIUK said he would be there no later than 8:10 am.

81.     At approximately 7:49 am, DORONIUK received an incoming call from Individual A. This telephone call was intercepted on Doroniuk Phone. They talked about how DORONIUK was waiting to go "north" (to go to the storage unit). DORONIUK told Individual A that he would call her afterwards and tell her how it went. Individual A told DORONIUK that hopefully he will find "a little surprise" (drugs and/or drug proceeds that DORONIUK could steal). DORONIUK said, "yeah, hopefully I find a little surprise..." (stolen drugs and/or drug proceeds).

82.     At approximately 8:12 am, an incoming call to Doroniuk Phone from Officer A was intercepted. DORONIUK told Officer A that he was on his way to "35" (the Branch 35 courthouse) now. Officer A asked if DORONIUK already got "his guy" (CROSS) and

DORONIUK responded yeah.

83.   At approximately 8:18 am on 8/18/2006, CW1 contacted agents shortly after CW1 received a telephone call from CROSS. During the telephone conversation between CW1 and CROSS, CROSS told CW1 that he talked to the POs. CROSS said that the POs were on their way to pick up CROSS to go to court to get a search warrant issued (for Unit 111, based on the information provided by CROSS to the POs the night before). CROSS was waiting for the POs on 89th Street. CROSS told CW1 that the two POs he dealt with on a regular basis (known to be DORONIUK and SHAMAH) and their supervisor were the ones who were going to execute the search warrant. The POs told CROSS that they were going straight to the storage facility after they left court. This telephone call was not recorded.

84.   DORONIUK was observed driving a CPD vehicle (CPD-IAD records confirm that the license plate on DORONIUK's vehicle belonged to a CPD tactical vehicle assigned to the 22nd District). Agents conducting surveillance observed DORONIUK pick up CROSS at approximately 8:15 am from a Walgreens parking lot. Surveillance agents also observed the same vehicle arriving at the Cook County courthouse located at 727 East 111th Street at approximately 8:26 am. DORONIUK and CROSS were observed entering the courthouse; CROSS and SHAMAH were then observed exiting the courthouse and getting back in the vehicle.

85.   At approximately 8:28 am, during an outgoing call intercepted on Doroniuk Phone, DORONIUK told SHAMAH to "walk" CROSS in (personally take CROSS to the judge) because they were not letting anybody in because the court was not open yet. SHAMAH indicated that he was going to walk CROSS in at that time. At approximately 8:47 am, in a call intercepted on Doroniuk Phone, SHAMAH called DORONIUK back to ask if DORONIUK was almost done.

DORONIUK said yes, and told SHAMAH to meet him in the back (of the courthouse).
DORONIUK, SHAMAH and CROSS were observed leaving the courthouse in DORONIUK's
CPD vehicle at approximately 8:49 am.

86.     At approximately 8:53 am, Officer A called DORONIUK to determine the status of
the warrant. This call was intercepted on Doroniuk Phone. DORONIUK told Officer A that they
were on their way. At approximately 9:07 am, Officer A called Doroniuk Phone, which was
answered by SHAMAH. SHAMAH asked Officer A if the Lieutenant was sitting right next to
him (in the car). Officer A said yeah. SHAMAH then told Officer A that was he going to talk
low because he did not know how loud the phone was (because Officer C and Officer A were
riding in the same car). SHAMAH then said, "if there's any way you can keep him out of that
public storage thing, I'd appreciate ... out of the unit. You know what I mean?" (SHAMAH
wanted Officer A to keep Officer C outside of the storage unit while the ripoff was in progress).
Officer A answered yeah. SHAMAH then told Officer A that he (Officer A) could just tell him
(Officer C) it is a small place that two should be enough to search. SHAMAH asked again,"you
know what I mean?" and again Officer A answered yeah. SHAMAH continued to say "if you can
just do that for me so me and Rich [DORONIUK] are in that 'cause you know, we gotta take care
of 'John Doe' [CROSS] if something is in there. You know what I mean?" (SHAMAH and
DORONIUK needed to take money from the search location to give to their informant). Officer
A said, "oh yeah." Officer A then asked how long it would take for them to get there, and
SHAMAH said fifteen to twenty minutes.

87.     At approximately 9:10 am on 8/18/2006, CW1 contacted agents shortly after CW1
received another telephone call from CROSS. During this call between CW1 and CROSS,

41

CROSS told CW1 that the POs would be at the storage facility in about twenty minutes. CROSS also told CW1 that the POs sent "some of their friends" over to the storage facility location to "sit on the place" (CW1 understood this to mean that the POs sent other police officers from the west side to watch the location while the search warrant was being obtained). This telephone call was not recorded.

88.     At approximately 9:17 am, an incoming call to Doroniuk Phone from Officer A was intercepted. SHAMAH answered the phone. Officer A told SHAMAH that it would probably be "all of us" going in (DORONIUK, SHAMAH, Officer A, Officer C, Officer D and Officer E). SHAMAH asks, "he" (Officer C) wants everybody in there, and Officer A said yeah. SHAMAH replied, "oh God" (SHAMAH was upset). SHAMAH later asked again if "he" (Officer C) wanted everyone to go in. Officer A again said yeah. SHAMAH told Officer A that he would talk to him (Officer C) when he got there (about staying outside of the storage unit).

89.     Agents conducting surveillance in the vicinity of the Grand-Kilbourn Self Storage facility observed DORONIUK and SHAMAH arrive in the CPD vehicle at a nearby warehouse parking lot at approximately 9:23 am. Surveillance agents observed DORONIUK and SHAMAH exit the same vehicle observed (1) picking up CROSS at Walgreens, and (2) entering and exiting the courthouse parking lot. DORONIUK and SHAMAH were observed wearing CPD identification. Officer A and Officer C were observed at the same location getting out of another CPD vehicle at approximately 9:23 am. The vehicle occupied by Officer A and Officer C had been parked in the lot since approximately 7:06 am. Two other officers, Officer D and Officer E, were also observed at the scene, in a vehicle parked on Kilbourn. Officer A, Officer C, DORONIUK and SHAMAH were observed entering the self-storage facility at approximately

42

9:30 am.

90.     While inside the facility, court-authorized video surveillance recorded visual, non-verbal activities in and immediately around Unit 111. This video recording depicts SHAMAH, DORONIUK and Officer D inside of Unit 111. Officer A was recorded standing in the hallway, along with another PO (possibly Officer C). A sixth PO (possibly Officer E) was also observed in the hallway. SHAMAH initially took the cardboard box (containing the cash) out of the garbage bag, and DORONIUK then stood near the box while SHAMAH continued searching the unit. The video surveillance did not record images of the POs exiting the unit because the recording device appears to have been moved or knocked over during the search. I have reviewed the video recording summarized above and believe that the video accurately depicts the POs named above inside the storage unit on 8/18/2006.

91.     Outside of the storage facility, surveillance agents observed the POs exiting the premises. At approximately 9:44 am, Officer A, Officer C, Officer D and Officer E were observed exiting the storage facility. Officer A, Officer C, Officer D and Officer E then stood outside of the facility for a short period of time while DORONIUK and SHAMAH remained inside the facility. At approximately 9:49 am, DORONIUK was observed exiting the facility carrying a cardboard box. He was also observed placing the box in the trunk of his CPD vehicle. DORONIUK's CPD vehicle was observed leaving the storage facility at approximately 9:50 am.

92.     DORONIUK and SHAMAH (riding in the same CPD vehicle) drove away from the Grand-Kilbourn Self Storage facility. Shortly thereafter, surveillance agents observed the vehicle pull over and stop. SHAMAH was observed handling an object that was in the trunk of the vehicle. Surveillance agents then observed the vehicle pull into an alley at approximately 9:54

43

am. DORONIUK's vehicle was then observed leaving the alley with the vehicle's emergency lights activated.

### 4.    Calls After the 8/18/2006 Storage Unit Ripoff Regarding Ripoff and Related Events

<u>Calls Immediately After the Ripoff</u>

93.    At approximately 10:04 am on 8/18/2006, an outgoing call was intercepted on Doroniuk Phone. The subscriber information for the telephone number called by DORONIUK lists an address on S. Kildare, believed to be the residence of DORONIUK's grandmother. The call was not answered, but DORONIUK was overheard in the background talking about how it was Friday, and "grandma" was at bingo. DORONIUK then said, "she's at bingo, I know she is" (nobody was home at the S. Kildare address). DORONIUK was then overheard saying, "uh that's not a good idea. I could ... you know what, is there a bag?" The call then terminated. At approximately 10:05 am, DORONIUK's vehicle was observed parked on S. Kildare, south of 47th Street (near the vicinity of a residence believed to be the home address of DORONIUK's grandmother). DORONIUK and SHAMAH were observed exiting the vehicle and walking on S. Kildare Avenue. After stopping at the Kildare address, DORONIUK's vehicle proceeded to the 22nd District headquarters building, where DORONIUK and SHAMAH were observed getting out of the vehicle at approximately 10:30 am. DORONIUK was observed removing the box from the trunk of the vehicle and carrying the box into the building.

94.    At approximately 10:15 am, an outgoing call to Officer D was intercepted on Doroniuk Phone. DORONIUK asked Officer D "how do I write this thing up?" (how does he prepare the report regarding the search at the storage facility) and asks "is there a charge if the dog

44

hits on it from drugs?" Officer D told DORONIUK to write it up as a "vice report." Officer D

asked DORONIUK how much was there (how much money was in the unit), and DORONIUK

told him it was in the trunk and it was about ten (thousand dollars) or maybe over ten (thousand

dollars). Officer D said, "I think it is over ten" (Officer D thought it was more than $10,000) and

told DORONIUK that if it was over ten (thousand dollars) DORONIUK needed to call the "Feds."

As indicated above, Officer D was intercepted on video surveillance inside Unit 111 during the

search.

     95.    At approximately 10:19 am, an outgoing call from Doroniuk Phone to CROSS was

intercepted. SHAMAH was using Doroniuk Phone. SHAMAH told CROSS that he had some

good news and some bad news. He told CROSS that there were no drugs in the unit. He added

that they (the POs) checked the records, and the guy was in there three times the previous day (the

logs maintained at the storage unit indicated that Unit 111 was accessed three times on

8/17/2006). SHAMAH told CROSS that the good news was that there was a box in there with

some money, but the Sergeant and Lieutenant were with them (DORONIUK and SHAMAH).

SHAMAH said that they (the Sergeant and Lieutenant) were driving to the station, and were right

behind DORONIUK and SHAMAH (who were riding in the same CPD vehicle). SHAMAH told

CROSS, "so we're gonna try to grab you something out of there, you know what I mean?"

(DORONIUK and SHAMAH would try to take some of the cash recovered from the search to

give to CROSS). CROSS said "OK, Mike."

     96.    During the same call, SHAMAH told CROSS that it was "the same kind of shit

that was in the other one" like radio equipment, tables, chairs and shit (the same type of items

were in the first storage unit ripped off by the POs on 6/13/2006). SHAMAH said, "but ... the box

45

was there, it was a little box. As soon as I felt it I knew there was no kilos in there" (the cash was contained in a small cardboard box). CROSS asked if it was in a garbage bag, and SHAMAH said yeah, the box was in a garbage ... just like "he" (CW1) said. CROSS said that the drug dealer must have "moved it" (taken the drugs out of the unit), and SHAMAH agreed. SHAMAH then told CROSS that "the majority of it I gotta inventory, you know what I mean?" (SHAMAH needed to turn in most of the cash found in the unit as evidence from the search). CROSS said right. SHAMAH said, "but I'm gonna get what I can" (SHAMAH would steal as much money from the recovered property as possible). SHAMAH also told CROSS that SHAMAH did not think there was "30" in there (SHAMAH did not think there was $30,000 in the unit). SHAMAH said he cut the box open, it was duct-taped, but it looked like somebody was in it from one section (it looked like someone had removed some of the cash from the box before the POs accessed the storage unit). SHAMAH told CROSS that they still had to count it, but he would bet his life there was not "30" ($30,000) in there.

97.     At approximately 10:30 am on 8/18/2006, CW1 contacted agents after CROSS called CW1. During this call between CW1 and CROSS, CROSS told CW1 that the POs had been to the storage unit and that they found money in a box. The POs told CROSS that they cut the box open. CROSS told CW1 that the POs' Supervisor and Lieutenant were with them during the search, and that no drugs were found during the search. CROSS also told CW1 that there was a "log" at the storage facility regarding access to Unit 111. The log showed that the "guy" (the fictitious drug dealer) was at the unit three times on the previous day (unbeknownst to CROSS or the POs, agents acting in an undercover capacity accessed Unit 111 by typing in the required password approximately three times on the afternoon of 8/17/2006). The POs told CROSS that

46

the guy went back to his unit after his drug deal with CW1 and took his drugs out of the unit. CW1 told CROSS that if there was no dope in the unit to "forget about it," and that CW1 did not want any money (CW1 did not want a share of the money taken from the storage unit by the POs). CROSS explained to CW1 that the POs said something about "logging" and that they had to go count the money. This telephone call was not recorded.

### DORONIUK and SHAMAH Discuss Amount and Division of Ripoff Proceeds

98.     At approximately 12:06 pm on 8/18/2006, an incoming call from (773) 615-7900, used by SHAMAH, was intercepted on Doroniuk Phone. SHAMAH asked DORONIUK if he (DORONIUK) was "happy with today" (satisfied with the ripoff). DORONIUK said, "oh, I'm happy" and said that he wished there was at least "one key, just to show..." (DORONIUK wished there had been at least one kilogram of narcotics to justify the search). SHAMAH said that Officer A came up to SHAMAH and told him it was good to do a search warrant and "turn in money like that" (it looked good to submit some amount of cash as evidence after a search). DORONIUK asked why Officer A said that. SHAMAH replied that it "looks good" that you inventory "seven thousand" (it makes the search look legitimate if you inventory $7,000). SHAMAH said that Officer A said, "why would you turn in something like seven grand," indicating that DORONIUK and SHAMAH were honest for turning in $7,000 (instead of a smaller amount).

99.     During the same conversation, DORONIUK asked SHAMAH what they were doing for "Larry" (CROSS), and asked if they were doing a "G" ($1,000) (DORONIUK wanted to know how much of the robbery proceeds they needed to give to CROSS as payment for his assistance). SHAMAH asked DORONIUK if he (DORONIUK) took a "G" (did DORONIUK

47

take an extra $1,000 for himself) and DORONIUK said no. SHAMAH said he thought

DORONIUK said "eight" ($8,000). DORONIUK clarified, "when I said eight I said one plus

eight ... one and eight, it was eighteen total" ($18,000 total cash in the storage unit). DORONIUK

continued, "do the math, five-five plus five-five is what?" ($5,500 each to SHAMAH and

DORONIUK). SHAMAH said eleven ($11,000). DORONIUK said, OK, plus "seven" ($7,000)

is a total of "eighteen" ($18,000). SHAMAH asked DORONIUK if they should give him

(CROSS) five hundred ($500) a piece. DORONIUK said, yeah, "from our thing" (from their

share of the robbery proceeds). SHAMAH again said that he thought DORONIUK took a "G"

($1,000) from there. DORONIUK said no. DORONIUK added, "I didn't want to go below that"

(DORONIUK did not want to inventory less than $7,000) because he was worried about what

"they" were going to say. DORONIUK asked SHAMAH what they should tell him (CROSS) that

they inventoried. SHAMAH suggested that they tell him "twelve" ($12,000), tell him we all (all

the POs at the search) took a "G" ($1,000) apiece or something.

### Calls Between CROSS and CW1 About Ripoff

100.    CROSS called CW1 again around 2:15 pm on 8/18/2006. CROSS told CW1 that

CROSS had been calling the POs; however, the POs were not calling CROSS back. CW1 was

aware that CROSS was referring to the two POs who used CROSS as the informant for a search

warrant obtained that morning (DORONIUK and SHAMAH). CROSS told CW1 that the POs

were supposed to give CROSS money (as his share of the proceeds from the robbery conducted by

the POs during the search that morning). CROSS told CW1 that he was trying to find out when

the POs wanted to meet with him to give him the money.

101.    During this call, CROSS also told CW1 about a conversation CROSS had with the

POs regarding the drug dealer whose storage unit they searched that morning. Specifically, the POs said that the drug dealer was "pulling [CW1's] leg" because the dealer went back to the unit to remove his drugs after he did the deal with CW1 (as explained above, CW1 previously told CROSS that there were drugs in the storage unit based upon what CW1 saw when he/she was at the unit for a drug deal; and agents accessed the unit in an undercover capacity several times on 8/17/2006, which was reflected in the log maintained at the facility and checked by the POs). This telephone call was not recorded; however CW1 advised agents of the content of the call.

DORONIUK Plans to Meet CROSS

102.    At approximately 2:39 pm on 8/18/2006, an outgoing call from DORONIUK to CROSS was intercepted on Doroniuk Phone. DORONIUK told CROSS that he would meet with CROSS during the day tomorrow "to give him something" (a share of the robbery proceeds) but he did not want to talk on the phone. They agreed to meet at 10:30 am the next day.

103.    At approximately 2:40 pm on 8/18/2006, CW1 placed a recorded telephone call to CROSS' cellular telephone, telephone number (773) 876-2945. CROSS told CW1 that the POs just called him. The POs told CROSS that they wanted to meet him at 10:30 am on 8/19/2006. CROSS explained to CW1 that he tried to ask the POs more details, but they said they did not want to talk to him about it on the phone. CW1 acknowledged this information and said, "you got on it." CW1 added that at least this time they (the POs) said there was some money (CW1 was referring to the ripoff conducted by the POs on 6/13/2006, after which CROSS told CW1 that no money was found). CROSS responded that the POs did not tell him how much money they found at the storage unit that morning. CW1 told CROSS that it might have been "more than 30" (i.e., more than $30,000).

49

104.   During the recorded call, CROSS also informed CW1 that the POs said they were going to "reach out and touch him" (the POs wanted to arrest the drug dealer who rented the storage unit). CW1 responded to CROSS, "let 'em get him then" (let the POs arrest the dealer). CW1 then asked what the POs could charge the dealer with if there was "no dope" in the storage unit. CROSS said to CW1 "you know what they do" (the POs can do whatever they want to do). CROSS then asked CW1 if CW1 had any "work" (drugs). CW1 said that he/she "ain't got nothin'." CROSS indicated that he was hoping to receive some of the drugs recovered by the POs from the storage unit during the ripoff. CW1 agreed, and said he/she was "waiting on that too." CW1 said that he/she and CROSS would have to wait until tomorrow at 10:30 (when the POs were supposed to meet with CROSS).

105.   At approximately 11:04 am on 8/19/2006, an incoming call was intercepted from CROSS to DORONIUK, who was using Doroniuk Phone. DORONIUK asked CROSS what area he would be hanging out in that morning. CROSS asked if DORONIUK was going to drop off something and tell him something. DORONIUK confirmed  that he was going to drop off something and tell him something. DORONIUK told CROSS "115" in the Jewel. CROSS asked what time, and DORONIUK said he would call.

106.   At approximately 11:23 am on 8/19/2006, DORONIUK called CROSS and told him to go to the 115th. CROSS told DORONIUK he would be there in fifteen minutes. Surveillance agents observed CROSS and DORONIUK meet at approximately 11:40 am.

### CROSS Meets CW1 to Give CW1 Share of Proceeds

107.   CW1 contacted agents at approximately 1:30 pm on 8/19/2006. CROSS called CW1 shortly before CW1 contacted the agents. CROSS talked about the search that was

conducted by the POs on 8/18/2006. The POs told CROSS that there was $7,000 in the storage

unit that they searched based on CROSS' information. The POs also told CROSS that they had to

turn in most of the drug proceeds found during the search because their supervisor was present for

the search. The POs met CROSS that morning and gave him $800 as his share of their recovery

from the search. CROSS told CW1 that he planned to come over to CW1's residence to give

CW1 a share of the money given to CROSS by the POs. This telephone conversation was not

recorded.

108.    CW1 talked to CROSS again shortly before 2:00 pm on 8/19/2006. CROSS

promised to give CW1 half of the $800 received from the POs (as CW1's share of the proceeds

recovered by the POs during the ripoff). CW1 understood that the money given to CROSS by the

POs was money taken by the POs during the search at the storage unit the previous day. CW1

confirmed that CROSS met with both of the POs who CROSS knew (believed to be DORONIUK

and SHAMAH) and that these POs gave CROSS cash. CROSS told CW1 he would be there

(CW1's residence) in a couple of hours. CW1 anticipated that CROSS would arrive at CW1's

residence around 4:00 pm. This telephone call was not recorded; however, CW1 advised agents

of the content of the call shortly after the call took place.

109.    CROSS came to CW1's residence on 8/19/2006, and left at approximately 4:36 pm,

at which time CW1 contacted agents and advised agents about the details of the meeting. CW1

was sitting on his/her front porch when CROSS arrived. CROSS sat with CW1 on CW1's porch

and handed CW1 $400 (consisting of four $100 bills). CW1 understood that CROSS received the

$400 from POs (believed to be DORONIUK and SHAMAH) who stole the money from a storage

unit during the execution of a search warrant the previous day. The POs gave CROSS a total of

51

$800 that morning (according to CROSS), and CROSS gave half of that amount to CW1 as payment to CW1 for the information provided about the subject of the search. CW1 was unable to determine whether CROSS had the rest of the stolen cash with him at the time CROSS met with CW1.

110.    While CROSS was at CW1's residence on 8/19/2006, he continued to talk about the events of the previous day. He told CW1 that when the POs executed the search warrant at the Grand-Kilbourn Self Storage facility, their Lieutenant and Supervisor were present. CROSS also told CW1 that the POs were mad that there were no drugs in the storage unit. The POs told CROSS, who informed CW1, that they were not going to get a search warrant the next time CROSS provided them with information from CW1, because they did not want to have to share the drugs and/or drug proceeds found during the search. CROSS asked CW1 for information about another location that could be robbed by the POs. CW1 did not provide any detailed information to CROSS. CW1 only told CROSS that "something" (another ripoff) would happen.

111.    After CROSS gave CW1 the money on 8/19/2006 and left CW1's residence, CW1 placed all of the money received from CROSS in a white envelope. CW1 gave the envelope containing the cash to agents. An analysis of the cash provided by CW1 revealed that the serial numbers on the four $100 bills matched the serial numbers on four of the $100 bills placed in the cardboard box (sealed with duct tape) that was left in storage Unit 111 by undercover agents on 8/4/2006.

<u>Additional Calls Regarding Ripoff Proceeds and Storage Unit Owner</u>

112.    At approximately 12:37 pm on 8/21/2006, CW1 received an incoming telephone call from CROSS. CW1 showed agents the caller identification screen on CW1's telephone so

52

that agents could view the incoming number. It was (773) 876-2945 (CROSS' cellular telephone number). CW1 answered the call and began talking to CROSS. Agents began recording this call at approximately 12:38 pm. CROSS asked CW1 if CW1 had any drugs. CW1 told CROSS that he/she would have more drugs on Friday (CW1 previously told CROSS that the fictitious drug dealer came to town on Fridays to conduct drug deals with CW1). After some discussion about drugs, CW1 asked CROSS if he had talked to the "people" (the POs who used CROSS to obtain the search warrant on 8/18/2006). CROSS responded that he had not talked to the POs. CW1 told CROSS that the POs "could have given us more than 800" and CROSS agreed (referring to the $800 taken by the POs during the 8/18/2006 search and then given to CROSS the next day). CROSS mentioned $7,000. CW1 asked CROSS if the POs' "cut" (the amount of cash they stole during the search) was $7,000. CROSS did not know, but he said that them other people put their hands on it too (referring to the other police officers present during the search).

113.    During the same recorded call, CROSS told CW1 that the storage unit tenant (whose name was a fictitious undercover identity) had been in the unit twice after he met with CW1, and that the tenant took money out too (as discussed above, CROSS previously told CW1 that the POs checked the logs at the storage facility to see how many times the unit had been accessed on 8/17/2006, the date of the fictitious drug deal with CW1). CW1 told CROSS that the "next time" (the next time CROSS and CW1 set up the drug dealer to be ripped off by the POs) CW1 was going to make sure that the "product" (drugs) was there. CROSS agreed, and told CW1 that the next time the POs will just go. CW1 responded, "oh, they gonna do it themselves?" and CROSS agreed. CW1 understood CROSS' statement to mean that the POs would not obtain a search warrant for the next location provided by CW1. Instead, the POs planned to break into the

53

location to steal the drugs and/or drug proceeds. CW1 acknowledged this information, and told CROSS that it takes time to get a search warrant. CW1 added that "if we tell them, they can just go do it" (meaning that as soon as CW1 provides a name and location to CROSS, CROSS will give the information to the POs, who will then go directly to the location to conduct the robbery).

114.  On 8/24/2006 at approximately 1:48 pm, CW1 placed a recorded call to CROSS on CROSS' cellular telephone, telephone number (773) 876-2945. CW1 told CROSS that he/she had a drug deal coming up and that he/she would "try to tear ... some off" for CROSS (CW1 would give CROSS a portion of the drugs purchased by CW1). CROSS acknowledged this information. CW1 told CROSS that CW1 had not talked to "old boy" yet (the fictitious drug dealer who CW1 and CROSS set up to be ripped off by the POs on 8/18/2006). CW1 also told CROSS "I ain't sayin' nothin'" (CW1 was not going to say anything to the fictitious drug dealer about the robbery that took place). CROSS agreed, and told CW1 that CW1 could not mention anything about it (because if CW1 had not set up the dealer to be ripped off by the POs, CW1 would have no knowledge of the robbery).

115.  During the same recorded telephone call, CW1 told CROSS that the people from out of town (CW1's fictitious drug dealer) were coming in town tonight or tomorrow (8/24/2006 or 8/25/2006). CW1 provided this information to CROSS because CROSS recently asked CW1 for drugs. CW1 added that he/she might get "a little something to work with," meaning some drugs that he/she could give to CROSS. CROSS told CW1 that he had not talked to the POs. However, CROSS told CW1 that he planned to call the POs because they previously promised to give CW1 some money to pass on to Individual B. CW1 understood that the POs had given money to CROSS for Individual B in the past because she used to serve as the informant for

search warrants obtained by the POs in connection with ripoffs.

116.    On 8/24/2006, at approximately 8:04 pm, an incoming call to Doroniuk Phone from CROSS' phone was intercepted. CROSS told DORONIUK that his "guy" (CW1) said that "dude" (the fictitious drug dealer) "ain't hollered or called or nothing" about the robbery of the drug money (the fictitious drug dealer had not spoken to CW1 about the 8/18/2006 ripoff). CROSS added that "he" (CW1) said something might be happening tomorrow (a drug deal might take place the next day). DORONIUK asked where and at what time. CROSS said he did not know.

117.    During the same conversation, CROSS asked DORONIUK if DORONIUK and "Mike" (SHAMAH) had anything for Individual B (CROSS's girlfriend previously used as an informant by SHAMAH and DORONIUK). DORONIUK said, "yeah, we can, I can meet you tomorrow." CROSS said OK, then continued to talk about information provided by CW1 about · drug deals (fictitious information provided by CW1). CROSS told DORONIUK that Individual B didn't know anything about their "business" (Individual B did not know that CROSS assisted the POs with ripoffs and that he shared in the robbery proceeds). DORONIUK said, "and she won't know unless you say something." CROSS agreed. DORONIUK then asked CROSS, "did you like what you, did you like, what uh, your present?" (did CROSS like the money that DORONIUK gave CROSS as CROSS' share of the robbery proceeds). CROSS said, "yeah," and mentioned something about DORONIUK's supervisor. DORONIUK said, "well, seven was inventoried" ($7,000 of the money found in the storage unit was turned in as evidence). CROSS said, "right, right, so seven was inventoried so that would mean ... you know everybody got what they wanted off the top" (only $7,000 of the total amount in the unit was inventoried because the

55

POs stole the rest of the money and split it up amongst themselves). CROSS then said, "we won with that" (the ripoff was successful). DORONIUK told CROSS that the "shit" was "messy" and that it looked like some "kid put it in the box and just threw it in there" (the manner in which the money was placed in the cardboard box was unorganized). DORONIUK went on to say that "it wasn't rubberband, it wasn't this, it was just thrown in a box and newspaper in it." He then said "if it was rubberband" or if it "was like taped, ... it would have been easier to, you know..." (it would have been easier to steal more money from the box if the money was bundled together). CROSS said yeah. DORONIUK said "you're grabbing one at a time" (DORONIUK had to take one bill out of the box at a time). CROSS said he believed DORONIUK, but he was upset that "he" (the drug dealer) moved "that other shit outta there" (the drug dealer moved the drugs out of the unit before the POs arrived). CROSS then said that they were going to "get him" and "he's upset, he wants to get his ass. He's mad ... my guy's mad at him so he gonna stay on his ass" (CW1 was upset that the drug dealer moved the drugs out of the unit, and therefore CW1 wanted to set up the drug dealer to be ripped off again). DORONIUK said alright, no problem. CROSS added, "he's gonna have some more of this too you know" (CW1 would have more information for the POs about future ripoff possibilities). DORONIUK said OK.

118.    At approximately 1:11 pm on 8/25/2006, CW1 placed a recorded telephone call to CROSS on CROSS' cellular telephone, telephone number (773) 876-2945. CW1 told CROSS that his/her "people" (drug customers) were in town but "old boy ain't got in touch with me." CW1 used the term "old boy" to refer to the fictitious drug dealer that CW1 and CROSS set up to be ripped off by the POs on 8/18/2006. CROSS asked CW1 if the drug dealer suspected CW1 of setting him up to be robbed. CW1 said no, and that he/she was not worried about that.

119.    During the recorded telephone conversation, CW1 asked CROSS if the POs ever gave him any money for Individual B. CROSS told CW1 that he saw the POs the previous day (8/24/2006), and that they said they would give him $100 the next day (8/25/2006). However, the POs called CW1 back and told him they would meet him tomorrow (8/26/2006) because they were working "traffic" that day. CW1 asked CROSS, "you pushed it this time?" and CROSS told CW1 that he did push the POs to give him the money they promised him.

### 5.    Summary of Search Warrant and Inventory Information Regarding 8/18/2006 Search of Storage Unit and Theft of Cash from Storage Unit

120.    CPD-IAD obtained a digital copy of the search warrant data form prepared in connection with the 8/18/2006 search conducted at Unit 111 at the Grand-Kilbourn Self Storage facility. This document was obtained by CPD-IAD from internal CPD electronic databases, and provided to the FBI. This form listed the following POs as participants in the search (each POs' assignment follows his name): DORONIUK, E, RICHARD (Affiant); SHAMAH, MAHMOUD (Entry); Officer C (Other CPD Division); Officer E (Perimeter); Officer D (Perimeter); and Officer A (Search Team Supervisor). The search warrant data form indicated that property was recovered from the search. One bundle of money (U.S.C.) is listed on the form as the recovered property.

121.    The CPD inventory report obtained from CPD-IAD's electronic database also listed one bundle of money as the property recovered from the search at 4500 W. Grand Avenue (the address of the Grand-Kilbourn Self-Storage facility). The CPD inventory report listed $7,000 as the total amount of money recovered from the 8/18/2006 search. This amount was broken down on the inventory report as follows: 56 $100 bills; and 28 $50 bills (as indicated above, the

government funds placed in Unit 111 by agents consisted only of $100 bills and $50 bills).

DORONIUK was listed as the investigating officer on the inventory report, and SHAMAH was

listed as the CPD employee who found the property during the search.

## C. Calls Intercepted Over Doroniuk Phone Regarding Search Warrants as Method to Conduct Robberies

### Call Between DORONIUK and CPD Officer G

122.    On 8/25/2006 at approximately 9:00 am, an outgoing call from Doroniuk Phone to

Officer G was intercepted. During the call, Officer G and DORONIUK discussed recent

developments with CPD police officers that were involved in criminal activities and various

rumors about such officers. DORONIUK told Officer G that the officers were doing home

invasions and stealing money. After more discussion of these matters, DORONIUK told Officer

G that the "feds are going after coppers man" (the FBI is investigating police officers). Officer G

said, "yeah, I know, that's why, a, everything's got to be tight" (illegal activities need to appear

legitimate). DORONIUK said, "yeah, I mean, ... the only thing they can't catch you on is if you do

a search warrant because it's your search warrant; you type it up, you do it, you execute it, it's

yours" (the FBI will not know that you are stealing money or property if you enter the premises

with a search warrant, and only the person preparing and executing the warrant knows the full

scope of the illegal activity). Officer G mumbled "yeah" while DORONIUK made this statement.

DORONIUK then said, "I'm talking about other shit man" (DORONIUK thought that only home

invasions without search warrants resulted in criminal investigations). Officer G laughed.

123.    During the same conversation, DORONIUK then said "because they, they're not

going to be able to set anything up while you get your fuckin' warrant or any ... it's impossible"

(the FBI would not have enough time to set up an operation while a search warrant was being obtained). Officer G agreed. DORONIUK continued, "plus when you do a search warrant, ten people or more go in. How you gonna prove who took what, if anything's missing" (if a PO enters a search location with a search team, and that PO steals property during the search, other law enforcement officers could not prove who stole the missing property during the search).

Call Between DORONIUK and Individual D

124.    On 8/31/2006 at approximately 2:00 pm, an incoming call to Doroniuk Phone from Individual D was intercepted. Individual D asked DORONIUK who was involved in the police scandal that was the topic of a newspaper article. DORONIUK told Individual D, "they [the officers who were the topic of the article] were doing some crazy shit. I knew that they were doing it." DORONIUK added, "you know, if you're going to take money, there's a way of taking money, you don't take it like the way they were doing it" (there is a way to rob victims without being caught). Individual D asked, "you don't get involved with that, do you?" DORONIUK responded, "no, I don't do it like that, no" (DORONIUK does not rob people like the officers described in the article, but perhaps some other way). Individual D then asked, "you don't do it like that?" DORONIUK responded, "no, I don't do crazy shit like that, that's stupid. You don't grab..." Individual D interrupted DORONIUK to ask what the officer in question had done. DORONIUK explained that the officers robbed houses while holding victims at gunpoint.

125.    During the same telephone conversation, DORONIUK explained to Individual D, "now, if you write up a search warrant and you do it, and you're doing it and you find money, and you only find it and nobody else, well, nobody knows but you, you know what I mean? That's a different way of doing it" (if a PO is the affiant for a search warrant, is present for the search and

59

in control of the scene, he or she could steal money without anyone else knowing about the theft).
DORONIUK continued, "But the way they were doing it they were doing some blatant crazy shit,
you know like home invasions and putting guns to people, handcuffing people" (indicating that
armed home invasions are blatant, unlike robberies conducted during a search pursuant to a search
warrant).

### Call Between DORONIUK and Unknown Individual

126.    On 9/6/2006 at approximately 9:50 pm, an outgoing call from Doroniuk Phone to
an unknown individual was intercepted. During this telephone call, DORONIUK and the
individual discussed the recent arrests of CPD officers who were conducting home invasions and
kidnaping people. DORONIUK told the individual that the arrested officers were "dirty." He
then explained that "it's one thing, you do a search warrant and you, and you-yourself, find money,
you, and, while ... as you're searching, but to take people hostage, put them on the ground, beat
them up ... holy shit" (again indicating that armed home invasions are blatant, unlike robberies
conducted during a search pursuant to a search warrant).

### Calls Between DORONIUK and SHAMAH

127.    On 10/18/2006 and 10/19/2006, DORONIUK and SHAMAH had several
telephone conversations in which they discussed a suspected investigation of the 22nd District
tactical team. These conversations were intercepted on Doroniuk Phone. One of these
conversations took place on 10/19/2006 at approximately 11:54 am, during an incoming call from
SHAMAH to Doroniuk Phone (which was intercepted on Doroniuk Phone). When DORONIUK
answered the phone, SHAMAH asked, "who do you think fucking the feds are watching man?"
DORONIUK started to respond, then SHAMAH interrupted DORONIUK to say that "we're the

only ones who stir up anything. Nobody's got balls back there to do anything fuckin' like ... you know what I mean? (indicating that DORONIUK and SHAMAH are more aggressive than the other members of their tactical team, therefore SHAMAH feared that DORONIUK and SHAMAH might be the officers under investigation).

128.    DORONIUK told SHAMAH, "well, well here's the thing. We're ... OK ... the, these, the guys in SOS were caught on tape" (referring to the recent investigation of CPD officers assigned to the Special Operations Section). SHAMAH responded, "yeah." DORONIUK continued, "OK. Now, they caught them on tape doing shit. I mean, going, you know, putting money in public storage. I mean they got them on a lot of shit. Those guys were never going to court. They never did war ... search warrants, you know that, right?" (the officers who were arrested never used search warrants as a means to conduct ripoffs, so their illegal activities were different than the activities engaged in by DORONIUK and SHAMAH). SHAMAH responded, "yeah." DORONIUK repeated, "They weren't doing search warrants. They were holding people hostage and doing that ... they were doing shit like that" (again indicating that stealing money and/or drugs while executing a search warrant was not something that could be detected, as opposed to holding people hostage). DORONIUK continued, "Now, what we get on the traffic stops, what we do, what we do, it's because we do it. We don't, you know what I'm saying?" (when DORONIUK and SHAMAH steal money and/or drugs from individuals during traffic stops, nobody other than DORONIUK and SHAMAH are aware of the incident since DORONIUK and SHAMAH are partners and ride together in the same vehicle). SHAMAH responded, "yeah, I know, I know." DORONIUK then asked SHAMAH, "Just think back to the past. Can you picture us on tape doing anything?" SHAMAH said no.

129.    During the same conversation, DORONIUK continued, "But what I'm saying to you is, what we do is ... like, you know, like this past week or, you know, when we made those traffic stops. I, we made it. We made that, that's ours. We picked it. Nobody gave it to us" (when DORONIUK and SHAMAH ripped off subjects during traffic stops the previous week, they identified the targets and nobody else was involved; therefore, it could not have been a setup by the FBI). SHAMAH responded, "No, I know, I know." SHAMAH told DORONIUK, "Let's be on our Ps and Qs, you know what I mean?" (DORONIUK and SHAMAH should be careful when conducting ripoffs). DORONIUK asked SHAMAH, "what's that?" SHAMAH repeated, "I'm just saying, let's be on our Ps and Qs, you know. Like fucking watch everything we fucking do, you know what I mean? I mean I'm all about getting the fucking bad guys but let's fucking, you know, be smart about it" (DORONIUK and SHAMAH needed to be careful when ripping off drug dealers or other criminals).

130.    DORONIUK told SHAMAH that a particular sergeant (Officer H) was going to call somebody to find out more about the rumored investigation. SHAMAH said, "Yeah, keep hounding him about it, maybe like, hey, what's going, you know what I mean, be like, you know, we do H.I.s (home invasions) and shit like that, is that what the [unintelligible]" (SHAMAH wanted Officer H to find out more about the investigation, and to find out whether the FBI investigation involves home invasions conducted by DORONIUK and SHAMAH). DORONIUK interrupted SHAMAH to say, "I already saw him today and I said that." SHAMAH asked DORONIUK for details regarding DORONIUK's discussion with Officer H. SHAMAH asked if Officer H only mentioned the investigation to DORONIUK. DORONIUK responded that Officer H told everyone (all of the tactical team officers), and that Officer H told the officers about a

"rumor" that "the 22nd District TACT is being watched" (referring to a rumor that the 22nd

District tactical team is under investigation). DORONIUK repeated, "The whole team, you know.

The whole TACT team is being watched."

131.    DORONIUK then said, "But you know what, we uh. I don't know. Have we been

accused of sh... Yeah, people accuse us of shit. But how can, here's the thing, how can you prove

it if you have no evidence. You know what I'm saying?" (DORONIUK was aware that he and

SHAMAH are accused of inappropriate or illegal activities, but there is no evidence of their

crimes). SHAMAH responded, "I know, but still, you don't know what they ..." (SHAMAH

agreed, but was afraid that he and DORONIUK did not know what the FBI knows about them).

DORONIUK said, "You know they were able to prove that shit with them because they got them.

You know they had evidence. I mean there's no, that's why whatever you got, you know, at

home..." (there was evidence against the SOS officers; there is no evidence against DORONIUK

and SHAMAH, but SHAMAH should destroy any evidence he has at his residence). SHAMAH

said yeah, and DORONIUK continued to say "...just get rid of it, you know" (destroy any evidence

at SHAMAH's residence). SHAMAH agreed, saying "yeah, yeah, I know." DORONIUK said "I

don't have shit. I never, you know" (DORONIUK did not keep any evidence of his crimes at his

residence). SHAMAH said, "I know." DORONIUK told SHAMAH, "You've got nothing to

worry about. You've done nothing." SHAMAH said, "well fuck it then, we'll talk later."

DORONIUK told SHAMAH that he would try to find out more information about the suspected

investigation from officers in his neighborhood.

**D.    Calls Intercepted over Doroniuk Phone Between DORONIUK, SHAMAH, and CROSS  Regarding Potential Home Invasions**

### 1.    Calls Regarding Potential Home Invasion of Storage Unit Owner

132.    On 9/5/2006, DORONIUK received information from the CPD Asset Forfeiture Department regarding the subject of the 8/18/2006 search (i.e., the ripoff at the undercover storage unit). During an incoming telephone conversation intercepted over Doroniuk Phone on 9/5/2006 at approximately 1:31 pm, a CPD employee told DORONIUK that the subject (the name associated with the undercover identity used to rent the storage unit) had various aliases, fake addresses and fake social security numbers. The CPD employee also told DORONIUK that the subject had been arrested in various states. Also during this conversation, DORONIUK told the CPD employee that "we hit his storage locker twice. This is the second time. The first time we got nothin.'" DORONIUK continued to say "and the second time is when we got all this money ... the first time we hit it was another storage locker five blocks east of the there ... with the same name ... but he left that now, he went to this new place, and we hit this, and we somethin' out of it now."

133.    Shortly thereafter, at approximately 1:48 pm, an outgoing call from Doroniuk Phone to (773) 615-7900, used by SHAMAH, was intercepted. During this call, DORONIUK told SHAMAH about the drug dealers' aliases, outstanding warrants for drug trafficking, and various addresses. DORONIUK told SHAMAH "we need to find him. I need to get in touch with Larry [CROSS]. We need to find out where the fuck, and follow his ass to where he goes" (DORONIUK wanted to locate the victim of the first two ripoffs and follow that individual to the individual's stash house). SHAMAH added, "find out where he lives."

134.   DORONIUK continued, "even if we gotta do this shit, you know off duty. I'll fuckin' follow him to wherever, put a ski mask on and go in that motherfucker" (DORONIUK would follow the drug dealer to his house and break into the house).  SHAMAH said, "no, I know, I know."  DORONIUK continued, "you know what I am saying, cause now I know he is a legit criminal, you know" (DORONIUK was more comfortable robbing the subject because the subject was a legitimate criminal).  DORONIUK later said, "we hit the big fish" (they located a significant drug dealer).  SHAMAH responded, "well good, let's fuckin' take the big fish down" (SHAMAH wanted to rob and/or arrest the drug dealer).  DORONIUK and SHAMAH then discussed how they planned to follow the drug dealer from the next location provided by CROSS to the drug dealer's home.

135.   After DORONIUK called SHAMAH, DORONIUK called CROSS.  At approximately 1:52 pm on 9/5/2006, an outgoing call from Doroniuk Phone to (773) 876-2945, used by CROSS, was intercepted.  During this call, DORONIUK asked CROSS if he (CROSS) had anything on the drug dealer (i.e., did CROSS have any information regarding the location of the drug dealer or his new stash location).  CROSS told DORONIUK that his (CROSS') guy (CW1) had not heard from the drug dealer.  DORONIUK then told CROSS, "we need to find out where this guy's going to be next" (DORONIUK needed to find the new location where the drug dealer kept drugs and/or drug proceeds).  CROSS said right.  DORONIUK continued, "we need to find out, and I'm gonna follow him to where he goes to sleep" (DORONIUK wanted to follow the drug dealer to his house).  DORONIUK then told CROSS about the drug dealer's aliases and outstanding warrants.

136.   During this call, DORONIUK instructed CROSS to have CROSS' guy (CW1) get

the cell phone number for the drug dealer. DORONIUK told CROSS that he (DORONIUK) would follow the drug dealer even if he had to do it on his own time (i.e., when DORONIUK was off-duty). DORONIUK told CROSS that he (DORONIUK) would "go in the house with him" (the drug dealer) and "get his [the drug dealer's] ass." DORONIUK added that if he could follow the drug dealer to his (the drug dealer's) house, "there might be a lot of shit in there" (a lot of drugs and/or drug proceeds in the drug dealer's house). CROSS said he would try to "put something together" (CROSS would try to arrange another ripoff for DORONIUK and SHAMAH). DORONIUK again stated that he would even do this on his own (DORONIUK would locate and rob the drug dealer on his own time without a search warrant). CROSS said he understood, because it might be "worth something" (there might be large quantities of drugs and/or drug proceeds at the next stash location). CROSS told DORONIUK that he (CROSS) would call his guy (CW1) and let him know what is up (CROSS would attempt to obtain information from CW1 about the drug dealer).

137.    During the same conversation with CROSS, DORONIUK continued to talk about robbing the drug dealer. He told CROSS that if he saw the drug dealer, he (DORONIUK) would "follow him and see where the hell he goes." DORONIUK continued to say that if he (the drug dealer) goes into a place where they (DORONIUK and SHAMAH) think he lives, then they (DORONIUK and SHAMAH) will "run up in there" (if DORONIUK and SHAMAH observe the drug dealer entering a house, they will break into the house).

138.    During this call, CROSS said he cautioned his guy (CW1) that the drug dealer might be trying to set him (CW1) up to see who is causing the drug dealer to get robbed (referring to the first two ripoffs arranged by CW1, CROSS, DORONIUK and SHAMAH). DORONIUK

said that if he (CW1) could tell DORONIUK where his (the drug dealer's) next spot is, "where he's hiding whatever," DORONIUK said he would not hit the locker, he would just follow the guy. CROSS said that they could not do anything until he (the drug dealer) got in contact with "my guy" (CW1). CROSS said that he talked to his guy (CW1) the previous day, and that he (CW1) had not heard anything from "that fool" (the drug dealer) yet.

139.    On 9/5/2006 at approximately 2:54 pm, a call between DORONIUK and Individual A was intercepted over Doroniuk Phone. During the call, DORONIUK told Individual A that he might not be able to stop by that night because of "that public storage thing" that he and Mike (SHAMAH) did (the ripoff at the Grand-Kilbourn Self Storage facility on 8/18/2006). Individual A acknowledged that she recalled the incident, and DORONIUK explained that they found out who the guy (the drug dealer) really was that day. DORONIUK then told Individual A about the drug dealer's aliases and outstanding warrants for drug trafficking.

140.    During the same call, DORONIUK also told Individual A that he (DORONIUK) and SHAMAH planned to follow the drug dealer to his (the drug dealer's) house on their personal time and in their personal vehicles. DORONIUK then described to Individual A the details of how he and SHAMAH would conduct surveillance. Individual A asked, "why, you want to break in his house and steal his money there?" DORONIUK answered, "I didn't say that, did I?" then laughed (indicating that Individual A was correct about DORONIUK's plans to break into the house to steal money). Individual A responded, "but that is what it is about, right?" DORONIUK said (in a sarcastic tone), "you know that's not what we do" (indicating that Individual A was correct again). Individual A said, "well hopefully you'll find something good" (Individual A hoped that DORONIUK could find drugs and/or drug proceeds to steal). DORONIUK responded,

67

"uh uh." DORONIUK said he wanted to get him (the drug dealer) because everyone has a warrant for him.

141.    During the conversation with Individual A, DORONIUK explained the false identification used by the drug dealer. DORONIUK then told Individual A "it would be nice to even get him, but before we get him and call, you know, the other people to pick him up, I'd like to see what's in his place, you know what I mean?" (DORONIUK wanted to rob the drug dealer's house before other officers arrived on the scene to assist with the arrest). Individual A said, "oh, I know what you mean." Individual A continued, "hopefully you get a nice big stash" (Individual A hoped that DORONIUK could find drugs and/or drug proceeds to steal). DORONIUK said, "I'm telling you ... but oh well, we'll see how that works out."

142.    After DORONIUK and Individual A discussed the manner in which DORONIUK and SHAMAH planned to follow the drug dealer and "get in his house" (conduct a home invasion), DORONIUK said he hoped it panned out. Individual A said, "there's nothing wrong with an extra stash of cash" (referring to cash found in the house, then stolen by DORONIUK). DORONIUK agreed. Individual A continued, "you always get the, get ... get a lump sum every ... you get something like practically every month don't you?" (asking whether DORONIUK was able to steal a large amount of money on a monthly basis). DORONIUK said, "nah, I don't do it every, I don't get something every month." Individual A said that would be nice.

143.    DORONIUK talked about getting this guy (the drug dealer). Individual A said, "hopefully you find lots of money" (in the stash house). DORONIUK said yeah. Individual A continued, "green's my favorite color" (Individual A likes cash). DORONIUK said, oh yeah. After continued discussion about the drug dealer's background, DORONIUK explained that the

68

drug dealer's money is most likely kept in a house. Individual A told DORONIUK to be careful in case there are other people in the house. DORONIUK told Individual A he planned to take his automatic M-16 with him.

## 2.    Calls Regarding Potential Home Invasion of Unknown Victim

144.    On 9/8/2006 at approximately 3:10 pm, an outgoing call from Doroniuk Phone to (773) 615-7900, used by SHAMAH, was intercepted. When SHAMAH answered the phone, DORONIUK asked "what do you think about doing an H.I.?" (home invasion). SHAMAH asked "where?" DORONIUK described an individual (Individual E) that Individual A knew, and explained that Individual E called Individual A while DORONIUK was with Individual A. DORONIUK told SHAMAH that Individual E moved into the City of Chicago. DORONIUK continued to explain that while Individual E was on the phone with Individual A, Individual E was sniffing coke (using cocaine). Individual E told Individual A that "he's got a few bags to drop off. He's got that shit today ... meaning cocaine, cause that's what he deals with, co ... a lot of coke" (Individual E was a drug dealer specializing in cocaine, and he received a shipment of cocaine that day).

145.    During the same conversation, DORONIUK told SHAMAH that Individual A was going to Individual E's house that night or the next morning "to get the exact address, the layout, if there's an alarm, plate off the car, everything" (Individual A planned to obtain firsthand information needed by DORONIUK to conduct a home invasion at Individual E's home). SHAMAH responded, "yeah, but we'll, we ... still we're talking about money, fuck the dope" (SHAMAH wanted to steal money, not drugs). DORONIUK responded, "yes, yes, that's what we're talking about" (DORONIUK also wanted to steal money). DORONIUK told SHAMAH

69

that Individual A told DORONIUK that Individual E "got busted" about ten years ago, and that "it was ... it was over a mil ... in his house, in his house" (there was over one million dollars in Individual E's home when he was previously arrested). SHAMAH said, "OK, well, let her find out if there's cash in there." DORONIUK continued, "OK, I said ... I told her, I told her don't ask about it. Don't, you know, if you see it, you see it" (DORONIUK told Individual A to look for drugs and money, but not to ask Individual E about drugs or money located in his home). DORONIUK continued, "If you see bags of fucking coke, that's ... where there's bags of cocaine like that, there's money" (if there are large amounts of cocaine in the house, there will also be large amounts of money in the house). SHAMAH responded, "yeah, I know but ..." DORONIUK continued, "so, hey this would be perfect man. I got a radio ... we wear a couple (unintelligible word) we go in" (DORONIUK had a police radio in his possession, so he could monitor the police radio in case an officer reported the robbery while it was in progress). DORONIUK continued, "It's just him by himself in the house that lives there" (Individual E lived alone in the house). DORONIUK told SHAMAH that she (Individual A) "said she's going to find out if there's any dogs, any fuckin' alarm, any, everything" (Individual A would identify any potential security that could detect the robbery conducted by DORONIUK and SHAMAH).

146.   During this conversation, SHAMAH said, "still, its gotta be more than like fifty Gs in there..." (more than $50,000 in the house). DORONIUK responded, "well, of course. I mean I wouldn't do it unless it's at least that" (DORONIUK did not want to rob Individual E unless Individual E had at least $50,000 in his house). SHAMAH responded, "yeah, I know." DORONIUK continued, "you know what made me really happy? It's in the city, and I could monitor the fucking zone, you know" (DORONIUK could monitor the zone police radio while

70

DORONIUK and SHAMAH were conducting the robbery because the house was within CPD territory). SHAMAH responded, "yeah, I don't care, just find out dude. Just find out what's in there" (find out if there is money in the house).

147.   During the same conversation, SHAMAH asked DORONIUK when Individual A planned to go to Individual E's house. DORONIUK explained that he instructed Individual A to remain sober and one hundred percent focused. SHAMAH said, "Listen Rich, you got to make sure you don't tell her we're doing an H.I. man" (SHAMAH did not want Individual A to know that he and DORONIUK planned to conduct a home invasion). DORONIUK responded "no." SHAMAH continued, "tell her we're going to do a warrant (tell Individual A that DORONIUK and SHAMAH planned to enter the house with a search warrant). You know what I mean?" DORONIUK said he was not going to go into details with Individual A.

148.   During calls intercepted between DORONIUK and Individual A over Doroniuk Phone later on 9/8/2006, Individual A told DORONIUK that she had not heard from Individual E yet, but that she would leave him a message. The next day, on 9/9/2006, during an intercepted call between Individual A and DORONIUK, DORONIUK asked Individual A whether she received a call from Individual E. Individual A said that she turned her phone off, but that she had no messages. On 9/16/2006 at approximately 2:28 pm, an incoming call from Individual A was intercepted on Doroniuk Phone. During this call, Individual A told DORONIUK that Individual E called and left Individual A a message. Individual A told DORONIUK that she would call Individual E back later.

149.   Later on 9/16/2006, at approximately 3:34 pm, a call between DORONIUK and Individual A was intercepted on Doroniuk Phone. Individual A told DORONIUK that she talked

71

to Individual E, and that Individual E wanted Individual A to "come out there" that day

(Individual E wanted Individual A to come over to Individual E's house). Individual A told

Individual E that she could not come over that day. DORONIUK responded, "yes." Individual A

then told DORONIUK that Individual E lived in Elmwood Park. Individual A and DORONIUK

then discussed the location of Elmwood Park, and the fact that it is "not cheap" to live there.

  150. During the same telephone conversation, DORONIUK told Individual A, "don't do

it tonight obviously" (do not go to Individual E's house that night to obtain information needed for

the home invasion). Individual A then asked DORONIUK if he wanted her to "make something"

for tomorrow (make an appointment to see Individual E), and then "give you that address and

everything" (give DORONIUK the information he previously requested regarding Individual E's

residence address, vehicle information, layout, security, etc.). DORONIUK answered, yeah.

DORONIUK then told Individual A, "I don't know if you'd be comfortable at ... I would do it

during the day." Individual A asked DORONIUK, "but you want me to find that exact address out

for you though right?" (DORONIUK wanted Individual E's exact street address so that he and

SHAMAH could go to the residence to conduct a home invasion). DORONIUK told Individual A

that he needed "the exact address that he lives, and if you see a car, run the ... give me the plate

(provide DORONIUK with the street address for the residence and the license plate information

for any vehicles observed at the residence). Individual A then told DORONIUK that she would

tell Individual E that she was coming over, and get the address from Individual E (obtain this

information during a telephone call before Individual A was supposed to go to Individual E's

house). Therefore, Individual A told DORONIUK that she did not have to go there and "you can

still do what you got to do" (DORONIUK can get the address from Individual A, then go to the

location to prepare for the home invasion). DORONIUK said, "there you go" (DORONIUK liked Individual A's idea). DORONIUK then told Individual A to tell Individual E that she needed the exact address for MapQuest. Individual A agreed. Individual A also told DORONIUK that Individual E drove a Mercedes. DORONIUK said to Individual A, "there you go ... that was smart." Individual A told DORONIUK, "You can go to the address and get the license plate number." DORONIUK said, "Yeah, I can go there. Just, hey, tell him you need his address for MapQuest, and I'll take care of the rest" (DORONIUK will obtain the rest of the information needed for the home invasion). Individual A said, "OK, I'll do that." Individual A said something about the weekend, and that "then you can do the bust" (DORONIUK can do the home invasion). Individual A told DORONIUK that she would talk to him about this later.

FURTHER AFFIANT SAYETH NOT.

JACQUELINE T. ALBUS
Special Agent, Federal Bureau of Investigation

Subscribed and sworn before me
on this 24th day of October, 2006.

Nan R. Nolan
UNITED STATES MAGISTRATE JUDGE

73